William E. BING, for himself and all other persons similarly situated, Plaintiff-Appellant,

v.

ROADWAY EXPRESS, INC., et al., Defendants-Appellees.

No. 72-2565.

United States Court of Appeals, Fifth Circuit.

Oct. 15, 1973.

W. M. Mathews, Jr., Atlanta, Ga., for plaintiff-appellant.

Charles Kelso, Atlanta, Ga., for Roadway Express, Inc.

L. N. D. Wells, Jr., and Robert L. Mitchell, Atlanta, Ga., for Local 728 of the Int'l. Brotherhood of Teamsters.

L. N. D. Wells, Jr., Dallas, Tex., for defendants-appellees.

Dennis F. Gordon, Atty., U. S. Dept. of Justice, Washington, D. C., John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., Joel L. Selig, Squire Padgett, David L. Rose, U. S. Dept. of Justice, Washington, D. C., amicus curiae.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

THORNBERRY, Circuit Judge:

In this Title VII action we are presented with the problem of how to provide a remedy for employees who suffered the ill effects of discrimination that resulted from Roadway's "no-trans-

fer" rule.[1] The trial court gave relief by enjoining future discrimination, ordering the issuance of a notice that required all discriminatees to come forward and present their claims, declaring that five blacks should be hired as road drivers with seniority to date from their first application for the job, and denying back pay for all concerned. From this decree plaintiff appeals, and we modify in part, affirm in part, and remand for redetermination of Bing's back pay.

## I. Factual and Procedural Background

This case has its origins in William Bing's 1967 charge that Roadway's "no-transfer" policy violated Title VII of the Civil Rights Act of 1964.[2] Briefly stated, that policy required an employee wishing to transfer from one collective bargaining unit to another to resign and then apply for the desired job, forfeiting all employment rights accrued under his old job. In this case, for example, a city driver who wanted to be a road driver would have to resign his position and then apply for the OTR (over-the-road) job as if he were a stranger to the company, with no assurance from Roadway prior to resigning his job that he would

be hired for the new position. Because this practice discouraged transfers and perpetuated the effects of Roadway's discontinued policy of hiring only whites for the position of road driver, this court found the no-transfer rule to be an unfair employment practice prohibited by Title VII and ordered the district court to fashion suitable remedial measures.

> Having determined that Roadway cannot use its no-transfer policy to bar Bing and the members of his class from applying for road driver positions without surrendering their current positions but, instead, must consider the applications and judge them by the same standards as all other applicants, we remand the cause to the district court for further proceedings consistent with this opinion.

Bing v. Roadway Express, Inc., 5th Cir. 1971, 444 F.2d 687, 691.

Having established Roadway's liability, we remanded the case to the district court. As its first remedial step the court ordered Roadway to issue a notice to all its black Atlanta terminal employees, advising them to make known in one month their interest in becoming a road driver.[3] The notice states that its

---

1. This is the second time we have heard this case on appeal. The first appeal concerned the issue of Roadway's liability. Bing v. Roadway Express, Inc., 5th Cir. 1971, 444 F.2d 687. Liability established, we are now faced with the remedial aspect of the case.

2. 42 U.S.C. § 2000e. The "no-transfer" rule violated 42 U.S.C. § 2000e–2(a), which provides:

> It shall be an unlawful employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

3. At the direction of the trial court Roadway promulgated the following notice dated January 7, 1972.

> To All Negro Employees of Roadway Express, Inc. at Atlanta, Georgia
> Re: Bing v. Roadway Express, Inc.
> Civil Action No. 11,144
> Gentlemen:
> In order to dispose of the litigation involving Bing and the Company, United States District Judge Albert J. Henderson, Jr. has directed that we identify for him those present Negro employees at the Atlanta terminal who would be interested in and qualified for a road driver position.
> Those present black employees at the Atlanta terminal who are interested in a road driver position are requested to advise C. W. "Joe" Varble in writing by certified mail no later than February 10, 1972. Mr. Varble's address is: c/o Roadway Express, Inc., 2701 Moreland Avenue, SE, Atlanta, Georgia, 30315.
> Those employees who so indicate their interest in a road driver position will then be requested to complete the usual appli-

purpose was to "identify [for the judge] those present Negro employees at the Atlanta terminal who would be interested in and qualified for a road driver position." The notice generated nine timely responses other than Bing's.

Of those who came forward, the court declared that Bing, Hubert Melson, Richard G. Hicks, James R. Johnson, and Willie Stroud, Jr., met "all of the defendant's standards for employment as road drivers, and are entitled to employment as road drivers." Their unit seniority[4] would run from the date on which they would have entered the road unit "but for discrimination." That date was determined by their first application for transfer to the road driving unit. They retained company seniority for fringe benefit purposes. The court chose the application date as the beginning point for back pay purposes as well, but it found that none of the men were entitled to back pay. Future transferees would get seniority from the date they enter their new unit.

For various reasons the court found that applicants John T. Johnson, Jesse Owens, John Dawson, and Roosevelt Presley were not qualified. Of those parties only the decision as to Johnson is appealed in this case. The court reserved decision on applicant Wess Shorty, Jr., until Shorty could produce evidence substantiating his claim to military driving experience. The court denied Emery Houseworth's application on the grounds that he failed to meet the deadline for responding to the court-ordered notice.

Besides granting relief in these individual cases the court enjoined Roadway from continuing its no-transfer rule and all other discriminatory practices. It required Roadway to judge future transfer applications of city employees by uniform, color blind standards.

While the court was devising an appropriate remedy on remand, two new faces appeared on the scene. The United States entered as amicus curiae and, at its suggestion, the court joined Local 728 of the International Brotherhood of Teamsters as a party defendant. The union's collective bargaining agreement with Roadway provided that job seniority for all workers would date from their entry into their bargaining unit, and the United States argued that the agreements should be reformed to give all affected class members company seniority for all purposes including layoffs and job bidding. Instead the court granted job seniority from date of application and not date of hire. In this appeal the union defends the court's solution.

## II. The Issues

The participants in these proceedings have raised three main issues on appeal. We must determine whether this is a class action, and, if so, what legal effect was created by the notice. Next in importance is the seniority issue—does the trial court's "application date" formula provide proper relief? A third issue, discussed primarily by the Government, is whether the court should have awarded (a) back pay to all injured class members and (b) back pay to Bing.

## III. Class Action

Rule 23(c)(1) of the Federal Rules of Civil Procedure requires that

As soon as practicable after the commencement of an action brought as a class action, the court *shall* determine by order whether it is to be so main-

---

cation forms, indicating among other things their prior road driving experience. The Company will process these applications and advise Judge Henderson of those present black Atlanta employees who meet Roadway's qualifications and requirements for a road driver position.

4. Unit seniority measures a worker's longevity relative to others in the same job or bargaining unit. In this case it determines his competitive position vis a vis his fellow road drivers for purposes of job bidding and layoffs. Company seniority is simply a measure of how long one has been with the company, regardless of the jobs held while in the company's employ.

tained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits. (Emphasis supplied.)

Fed.Rules Civ.Proc. Rule 23(c)(1), 28 U.S.C. Plaintiff's complaint labeled his suit a class action, but the trial court never entered a 23(c)(1) order. Although no one raised this problem in the proceedings below, the absence of a 23(c)(1) determination raises three questions on appeal. Is this a class action? Under what section of Rule 23? What is the class? By examining the briefs and the record we must put the proper labels on the substance of the proceedings below.

### A. *Is this suit a class action?*

█ The district court's failure to rule whether this case was a class action apparently escaped the attention of all the parties in the proceedings below. Nowhere in the record do we find a motion by plaintiff-appellant that his cause be determined a class action, and likewise missing from the record is any objection by defendants-appellees that it would be improper to frame this suit as a class action. Roadway raises this issue for the first time on appeal, and presents this court with a novel question: Can a class action exist without a formal, explicit determination by the court? For the reasons stated below we conclude that in this case we may infer that the trial court approved the class action nature of this lawsuit.

It was apparent from the beginning that Bing intended his suit to be a class action. The action was brought by Bing on behalf of himself and "all others similarly situated." He complained that Roadway's no-transfer rule discriminated against himself and "all others similarly situated, and his complaint alleged that the union's regulations and policy were discriminatory toward Negroes and prevented "Negroes from having equal employment. . . ." For relief he asked the court to enjoin the union from "discriminating against petitioner and others similarly situated," to award him damages and all other relief that was just or required. Thus this case differs from Danner v. Phillips Petroleum Co., 5th Cir. 1971, 447 F.2d 159, where we held that class relief was not appropriate because " . . . class action relief must be predicated upon a proper class action complaint satisfying all the requirements of Rule 23." *Id.* at n. 10, p. 164. In that case plaintiff's complaint alleged only discrimination against herself and requested relief only for herself. In this case Bing alleged harm to a class and requested relief for a class.

Although the complaint must have notified Roadway and the union that Bing sought class relief, the record reveals no objection to, or motion to dismiss because of, the class nature of this action. We infer from the record's silence that all parties to the action knew of its class nature and acquiesced in it.

We infer that the trial court also believed the suit to be a class action. After this court remanded the case for remedial proceedings, Bing moved to amend his complaint. In its order denying the motion to amend, the court said, "[t]his case was originally filed as a class action. . . ." The court described the amendment in a manner that indicated awareness and approval of the action's class nature.

> By such amendment the plaintiff seeks to specify certain members of the class for the purpose of presenting their claims for differential back pay and seniority rights.

The court in that order went on to express misgivings about the appropriateness of awarding back pay in a class action. Furthermore, the court indicated that defendant-appellee Roadway also believed the action to be a class action. "The defendant has filed a brief in opposition to the plaintiff's motion to amend arguing that relief in a class action is proper only for general and future relief."

The judgment rendered by the trial court indicates that the suit retained its

class nature throughout the proceedings below. It recited that Bing had brought the action on behalf of himself and all black employees of Roadway. It enjoined Roadway and the union "from engaging in any act or practice at the Roadway Express, Inc., Atlanta, Georgia facilities which has the purpose or effect of discriminating against any individual because of his race or color." It also ordered Roadway to abolish its no-transfer rule and judge its city employees' OTR applications by the same standards applied to all other applicants. Seniority for all transferees going from one bargaining unit to another would be full company seniority for fringe benefits and unit seniority for other purposes. In other words, the court enjoined present and future discrimination against Roadway's black employees and thus gave relief that was aimed at a class of people. Such relief is in keeping with the thesis that the trial court believed the suit to be a class action.

We conclude that the trial court implicitly determined that this suit would be maintained as a class action. Roadway discriminated against a class, class relief was sought, and class relief was given. The parties and the court believed that this was a class action. No objection was registered below. To say that this is not a class action would be to ignore the substance of the proceedings below in favor of an excessively formalistic adherence to the Federal Rules of Civil Procedure. We believe the trial court's implicit determination of the class action question satisfies Rule 23(c)(1).

### B. *What type of class action?*

■ The instant suit is the type properly brought under Rule 23(b)(2). That section is designed for a situation in which

. . . the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.Rules Civ.Proc. 23(b)(2). In the instant case Roadway refused to hire blacks as road drivers; its no-transfer rule and the union's seniority scheme perpetuated the effects of Roadway's discrimination. Such conduct clearly constitutes acting "on grounds generally applicable to the class." The Advisory Committee, moreover, has said that civil rights actions aimed at discrimination are examples of the type of suit contemplated by (b)(2). 39 F.R.D. at 102. This is just such a suit. Although this suit arguably could have been brought as a (b)(3) action, (b)(2) actions generally are preferred for their wider res judicata effects. *See* Johnson v. City of Baton Rouge, 50 F.R.D. 295 (E.D.La. 1970); Mungin v. Florida East Coast Railway Co., 318 F.Supp. 720 (M.D.Fla. 1970), aff'd per curiam, 5th Cir. 1971, 441 F.2d 728, cert. denied 1971, 404 U.S. 897, 92 S.Ct. 203, 30 L.Ed.2d 175. 3 B Moore's Federal Practice, ¶ 23.31[3].

### C. *Who are the class members?*

■ The trial court failed to follow explicitly the mandate of Rule 23(c)(3).

The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class.

Fed.Rules Civ.Proc. Rule 23(c)(3), 28 U.S.C. Nevertheless we believe the judgment by implication describes the scope of the class.

■ The judgment, findings of fact and conclusions of law were all included in an order of the court dated May 19, 1972. In the first paragraph of that order the court stated that Bing instituted this action "on behalf of himself and all black employees of Roadway Express, Inc." In one of its initial remedial steps the court ordered defendant Roadway to notify all its black employees at the Atlanta terminal to come forward if they

desired a road driver position. In the first paragraph of its judgment the court said, "A full evidentiary hearing having been had on the issue of relief for the plaintiff and affected members of the class of black employees of Roadway Express, Inc. . . . ." These statements indicate that the court intended the class to include all black employees at Roadway's Atlanta terminal. Our belief is corroborated by the court's enjoining Roadway from "engaging in any act or practice at the Roadway Express, Inc., Atlanta Georgia facilities which has the purpose or effect of discriminating against any individual because of his race or color. . . ." Broad injunctive relief barring racial discrimination is a proper remedy for the protection of all black employees at the terminal.

■ Besides broad injunctive relief for the class as a whole the trial court also gave individual remedies to certain "affected members of the class."[5] In effect these were individual actions separate and apart from the class action. The presence of individual claims does not necessarily destroy the class nature of a lawsuit. "The court has the power under subdivision (c)(4)(A), which permits an action to be brought under Rule 23 'with respect to particular issues,' to confine the class action aspects of the case to those issues pertaining to the injunction and to allow damage issues to be tried separately." C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1775 at 23. These individual claims were incidental to the instant class action's primary objective of ending racial discrimination at Roadway's Atlanta terminal. Therefore they did not destroy the nature or scope of the class action.

### D. *The Notice.*

■■ The class members entitled to individual relief were identified by a no-tice sent out at the court's direction.[6] The stated purpose of this notice was to identify "those present Negro employees at the Atlanta terminal who would be interested and qualified for a road driver position." Before the notice's one-month deadline expired, nine employees (besides Bing) responded and the court found that four were qualified to become road drivers. The notice was not mandatory but was a discretionary notice authorized by Rule 23(d)(2):

> In the conduct of actions to which this rule applies, the court may make appropriate orders: . . .
>
> (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members . . . of the opportunity of members . . . to intervene and present claims. . . .

Fed.Rules Civ.Proc. Rule 23(d)(2), 28 U.S.C.

We see nothing wrong with making an expression of interest prerequisite to individual employee remedies. This technique was used by the court in the seminal, widely approved Title VII case of Quarles v. Philip Morris, Inc., E.D.Va. 1968, 279 F.Supp. 505, 520. There the court required the employer to draw up a roster of eligible employees in fifteen days and ascertain their interest in transferring within just ten more days.[7]

Appellant complains that the notice did not explain road driver applicants' rights fully and therefore should not bar relief to those who failed to respond to it before the deadline. In authorizing this notice the trial court was exercising its discretion to fashion equitable relief. We must remember that the power of the district court to fashion an equitable remedy is broad.

---

5. The court granted the transfer applications of William E. Bing, Hubert Melson, Richard G. Hicks, James R. Johnson and Willie Stroud, Jr. In addition the court adjusted Bing's unit seniority upward.

6. The notice is set out in note 2, *supra.*

7. *See also* Foster v. City of Detroit, 6th Cir. 1968, 405 F.2d 138 (Class members required to submit individual claims within six months of decree establishing liability.)

Once a right and a violation have been shown, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

Swann v. Charlotte-Mecklenburg Board of Education, 1971, 402 U.S. 1, 15, 91 S. Ct. 1267, 1276, 28 L.Ed.2d 554. Generally, the exercise of this equitable discretion will be disturbed on appeal only for an abuse of discretion.

Keeping in mind that liberal standard of review, we conclude that the notice's language was adequate to announce the opportunity for blacks to become road drivers, and its thirty-day deadline was a reasonable tool for expediting the suit and managing the possible claims. Therefore those who failed to make a timely response cannot claim relief in this action. If an employee "sleeps on his rights" the court is well within the bounds of its equitable discretion if it declines to extend relief.

## IV. Seniority Rights

At issue here are the seniority rights of three men: Bing, Melson, and Johnson. The Government contends that this issue properly includes the seniority rights of the entire class and all its affected unnamed members, but we believe the trial court's notice to all class members bars here all those who did not respond within the specified time period. The trial court allowed only Bing and the nine others who responded to the notice to raise their claims below, and those are the only claims before us on appeal. The trial court found, and we agree, that five of the employees were not entitled to road driving jobs because they were not qualified.[8] Naturally

their seniority rights are not in issue. Two of the men awarded road jobs, Hicks and Stroud, soon returned to their city driving jobs; therefore their seniority rights as road drivers are not in issue here.

The court in the instant case recognized correctly that the proper goal was to give transferees the bargaining unit seniority rights they would have enjoyed but for Roadway's discrimination. Accordingly the court chose the date when the transferees applied to become road drivers. That formulation was reasonably favorable to Bing, for the court chose April 11, 1966, as his application date. The others, however, applied in response to the January 1972 court-ordered notice, so their seniority rights are minimal. The court was more generous in regard to vacations and other fringe benefits, allowing the transferees to keep their company seniority for those purposes.

The Government, as amicus, argues that the trial court should have allowed full seniority carryover for the transferees. That would mean the transferees could use their company seniority for all purposes—fringe benefits, layoff rights, and job bidding. The Government argues that anything less than full carryover will inhibit transfers by decreasing job security and will place black transferees forever behind their white contemporaries in competition for future vacancies in their new OTR classification. That contention outrages the union, which sees it as an attempt to reform its collective bargaining agreement by eroding the departmental seniority system, a drastic step that never was requested by Bing or other class members.[9] Drastic step or not, we will

---

8. The five unqualified employees were John T. Johnson, Jesse Owens, John Dawson, Roosevelt Presley, and Wess Shorty. The court agreed that Shorty would be found qualified if he could produce evidence of his prior military driving experience in thirty days.

9. We regard as without merit the contention that Bing never sought readjustment of dis-

criminatees' seniority rights. We acknowledge that Bing's complaint was not artfully drawn, but it described the injustice inherent in requiring transferring discriminatees to give up their accrued seniority rights, and it asked for all relief that is "needed, just or required." His brief, albeit artlessly, also requests an adjustment in seniority rights.

not hesitate to reform a collective bargaining agreement that produces a discriminatory effect violating Title VII.

While Roadway's no-transfer rule was in effect, blacks were effectively barred from entering the bargaining unit occupied by drivers. Now that the rule has been abolished by court order they may transfer to the road driving unit if they are qualified, but that unit's collective bargaining agreement requires that their job (or unit) seniority date from their entry into the unit. Job seniority controls such important areas as job bidding and layoff rights. Consequently, the most recent arrivals in the unit enjoy the least job security and the poorest upward mobility. Negroes who can now become road drivers, but who were qualified long ago and were blocked only because of the no-transfer rule, would be the most junior men in the unit if and when they transferred. It is possible that if Roadway's policy had not been discriminatory, today's transferees may have transferred long ago and have built up years of seniority. Therefore we will not hesitate to boost the seniority of discriminatees in order to make them whole.[10] It is not enough that this departmental seniority system is racially neutral on its face; like the no-transfer rule, it preserves the effects of Roadway's discontinued discriminatory hiring policies, and thus violates Title VII. This court has said:

> It is not decisive therefore that a seniority system may appear neutral on its face if the inevitable effect of tying the system to the *past* is to cut into the employees *present* right not to be discriminated against on the ground of race. The crux of the problem is how far the employer must go

to undo the effects of past discrimination. Local 189, United Papermakers and Paperworkers v. United States, 5th Cir. 1969, 416 F.2d 980, 988, cert. denied 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (Wisdom, J.).

*See* United States v. Jacksonville Terminal Co., 5th Cir. 1971, 451 F.2d 418, cert. denied 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815. Note, 80 Harv.L. Rev. 1260, 1967. Nevertheless we choose not to adopt the Government's position.

We believe the wisest course lies between those advocated by the Government and the trial court. We will follow the "rightful place" theory adopted by this Circuit in Local 189, United Papermakers and Paperworkers v. United States, 5th Cir. 1969, 416 F.2d 980. Under that theory blacks are assured "the first opportunity to move into the next vacancies in positions which they would have occupied *but for* wrongful discrimination and which they are qualified to fill." United States v. Georgia Power Co., 5th Cir. 1973, 474 F.2d 906. Thus blacks confined by discrimination to certain positions must be given the opportunity to transfer into the formerly "white" positions as vacancies occur in order to assume their "rightful place." A complete decree must give enough relief to insure that the transferred discriminatees are able to *maintain* their rightful place. Thus the rightful place theory dictates that we give the transferring discriminatee sufficient seniority carryover to permit the advancement he would have enjoyed, and to give him the protection against layoffs he would have had, in the absence of discrimination. How much seniority the transferee deserves should be determined by the date he would have transferred but for his employer's discrimination.[11]

---

10. The federal courts' power to modify or suspend the operation of a discriminatory seniority system is not affected by the fact that the seniority system has been established in a private collective bargaining agreement. Vogler v. McCarty, Inc., 5th Cir. 1971, 451 F.2d 1236.

11. The court in United States v. Bethlehem Steel Corp., 2d Cir. 1971, 446 F.2d 652, faced the problem of insuring the transferring discriminatees are given enough aid to enable them to continue their advancement as though discrimination had not occurred. There the court awarded full company sen-

Under the "rightful place" theory the Government's position is unsound. As amicus it would have us date seniority from the transferees' entry into Roadway employment regardless of their qualifications upon arrival at Roadway. That approach applied as a general rule could operate to give transferees more seniority than they would have had in the absence of discrimination. In this case, for example, until 1970 Roadway required prospective road drivers to have one year of road driving experience, and in 1970 it altered the requirement by allowing city driving experience to substitute for road driving experience. If the transferees were not qualified to become road drivers until they had worked for Roadway at least one year, their job seniority should not antedate the first anniversary of their arrival at Roadway. Before that date discrimination could not have blocked their employment as road drivers.

The trial court, taking a position endorsed by the union, would measure job seniority from the date when the transferee first applied for a road driving position. The rationale underlying this position is that we cannot determine if discrimination has occurred until an employee attempts to transfer. Since our goal is to put him in the position he would have enjoyed but for discrimination we must know when the discrimination occurred.

We recognize the logic of that argument, but it fails to account for the realties of entrenched employment discrimination. If an employee realizes full well that blacks simply are not hired as road drivers, why should he bother to apply? Certainly a few, such as Bing, have the courage to fight "the system," but it is equally certain that others must have been intimidated and discouraged by Roadway's discriminatory practices. For that reason we believe it is an unsound policy to date transferees' job seniority from their first application for transfer.

We choose instead to modify the Government's company seniority proposal and date the transferees' road unit seniority from the date they possessed the experience necessary to qualify them to enter the road driving unit.[12] Bing met Roadway's OTR experience requirements when he first reported to work on April 2, 1964. We recognize that Bing's hire date antedates the Act's effective date. However, as applied to Bing the union's job seniority rule preserves the present effects of past discrimination and thus violates the Act. Since that rule violates the Act we must suspend its operation as to Bing, leaving his company seniority as the proper criterion for determining his employment rights. *See* Local 189, United Papermakers & Paperworkers v. United States, 5th Cir. 1969, 416 F.2d 980; Quarles v. Philip Morris, Inc., E.D.Va.1963, 279 F.Supp. 505.

An intervening factor prevents our giving the other two transferees, Melson and Johnson, job seniority from the date they were qualified to become road drivers. Both had had previous road driving experience when they went to work for Roadway as city drivers, and therefore they were qualified by Roadway's standards to become road drivers. Melson went to work on April 7, 1969, and Johnson was hired on July 13, 1970. From October 18, 1968 to April 1972, Roadway hired no new road drivers in Atlanta, and in August 1969 it began laying off road drivers. Mel-

---

iority carryover in place of job seniority. Substituting company seniority for job seniority is not an unusual remedy. *See* Local 189, United Papermakers and Paperworkers v. United States, 5th Cir. 1969, 416 F.2d 980; Quarles v. Philip Morris, Inc., E.D.Va. 1968, 279 F.Supp. 505.

12. We emphasize that our "qualification date" formulation is a variation on the theme of company seniority carryover, an approach approved by this circuit. *See* Local 189, United Papermakers and Paperworkers v. United States, 5th Cir. 1969, 416 F.2d 980, cert. denied 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; United States v. Jacksonville Terminal Co., 5th Cir. 1971, 451 F.2d 418, cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815.

son and Johnson were among the first road drivers to be hired following the layoff period. Even without racial discrimination, Melson and Johnson would not have been hired as road drivers during this period. Therefore we cannot say they are entitled to job seniority dating from their qualification date, which in this case is their date of entry into the company. Under the rightful place theory we conclude that the trial court correctly awarded them seniority dating from their application for road positions, but only because the application date marks the earliest opportunity following their qualification dates at which any applicant could have been hired as a road driver. We disapprove an "application date" test standing alone.

The Government contended that anything less than full seniority carryover for all blacks seeking road driving jobs would discourage black transfers and place the black transferees "forever behind their white contemporaries" in the road unit. We emphasize that only those incumbent blacks who might have lost an opportunity to become road drivers because of Roadway discrimination are in need of augmented seniority. Roadway's present hiring and transfer policies, and the union's seniority system, treat new employees impartially. The court-ordered notice to all black Roadway employees brought forth some whom discrimination had prevented from becoming road drivers, and our decree gives them the seniority they would have had but for discrimination. Qualified newcomers are free to apply, and if accepted they will get the same seniority rights (date of entry into the unit) as the white applicants. In short, incumbents who have suffered discrimination will be accorded seniority in accordance with their rightful place in the absence of discrimination, and all future applicants' job seniority will date from their date of entry into the road unit.

## V. Back Pay

The back pay issue in this case is narrow and relatively simple. Are William Bing, John T. Johnson, and Wess Shorty, Jr. entitled to back pay, and if so, how much? At oral argument Bing's counsel clearly expressed his demand that these three class members, and only these three, should receive back pay.

The Government, as amicus, seeks to broaden the issue by framing it as whether or not the trial court should have awarded back pay to all members of the affected class. We have already determined that the trial court's notice effectively brought forth all class members who deserved individual relief in this proceeding. Of the five who were entitled to road jobs, only Bing was blocked by discrimination from entering the OTR unit. The other four are not entitled to back pay because they were hired by Roadway in a period when no road drivers were hired; even if Roadway had not been discriminatory, they could not have obtained road jobs earlier than they did. Therefore they suffered no financial loss from Roadway's discrimination. Furthermore, their right to back pay was not raised on appeal, and it is not an issue before this court. As amicus curiae the Government cannot control the course of this litigation to the extent of requesting individual relief not requested by anyone else. See 1B Moore's Federal Practice ¶ 0.411[6], p. 1551.

John T. Johnson and Wess Shorty are not entitled to back pay because the trial court did not find that they were entitled to road jobs. In its findings of fact the court recited that Johnson has worked for Roadway in a non-driving capacity since 1965, has applied for a road job, but has not been able to substantiate his claim to prior road driving experience. Roadway now accepts one year of Roadway city driving experience in lieu of road experience, but Johnson has done no city driving with Roadway. Therefore the trial court found that Johnson's failure to confirm his prior road experience, a requirement all applicants must meet, disqualified him from the road unit at this time. We cannot say the trial court abused its discretion in reaching that

conclusion. Title VII disapproves preferential treatment on the basis of race,[13] and Roadway uniformly requires confirmation of road driving experience. To require it of Johnson is not discriminatory; to drop the requirement would be preferential treatment. Similarly we conclude the trial court did not abuse its discretion in refusing to grant Wess Shorty a road job until he submitted evidence of his claimed prior military driving experience.

■ Bing's back pay claim is more difficult. The trial court resolved it by awarding him the difference between the amount a road driver would have made from April 11, 1966 until the time of trial, and the amount he actually made as a city driver and "moonlight" worker. Because the difference was a negative sum, Bing received no back pay. Although Bing had made earlier applications for the road unit, the trial court without explanation chose one made in April 1966 to represent the starting point for his back pay. We think this is error; even if an application date is the proper place to begin, the court should have chosen the date of his first application in 1965. Again, however, we believe that a transferee's qualification date, rather than his application date, should be determinative. Bing was qualified for road driving on April 2, 1964, and his legal right to be a road driver accrued on Title VII's effective date, July 2, 1965. Thus on that date his continuing legal injury originated. Consequently we remand this portion of the case to the district court for a recalculation of Bing's back pay from July 2, 1965.[14]

Calculating Bing's back pay is made difficult by his "moonlight earnings" and by a road unit layoff that would have reduced his earnings as a road driver to nothing for a nineteen-month period extending from August 1969 through March 1971. The district court approached the problem by first calculating the amount a road driver would have made, less his expenses, during the period when discrimination relegated Bing to a city driving job. The trial court allowed no earnings for the period August 18, 1969 to March 28, 1971 because it found that Bing would have been laid off. Counting the layoff and a road driver's expenses Bing, the court found, would have made $52,980. As a city driver during the same period of time Bing actually made $43,649, and he "moonlighted" at various driving jobs to make an additional $11,238. The trial court found that as a road driver Bing would have had to work sixty to one hundred hours per week and thus would not have had time to work extra hours at odd jobs. The court found he would have had to forgo the extra $11,238 if he had been a road driver; it therefore subtracted that amount, plus his earnings as a city driver, from the $52,980 he would have made as a road driver. In other words, with his city driving job, extra jobs, and the layoff of road drivers, Bing was better off financially as a city driver than as a road driver during the pertinent period. Accordingly the trial court awarded Bing no back pay.

Bing complains on appeal that his outside earnings should not have been deducted from his back pay award, and the Government urges that Title VII con-

---

13. 42 U.S.C. 2000e–2(j) provides in pertinent part:

Nothing contained in this subchapter shall be interpreted to require any employer . . . subject to this subchapter [Title VII] to grant preferential treatment to any individual or to any group . . . .

14. Title VII has recently been amended to provide that "back pay liability shall not ac-

crue from a date more than two years prior to the filing of a charge with the Commission." 42 U.S.C.A. § 2000e–5(g) (Supp. 1973), amending 42 U.S.C.A. § 2000e–5(g) (1970). The amendment, however, is effective only as to charges pending with the EEOC on March 24, 1972, and charges filed thereafter. Therefore the amendment is irrelevant to the instant case.

templates no reduction in back pay for moonlighting or, in the alternative, only the moonlight earnings that fell outside the layoff period should be deducted. The Government's first argument requires us to consider the applicable part of Title VII.

> Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e–5(g). The Government urges that we harmonize the phrases "interim earnings" and "amounts earnable with reasonable diligence" by interpreting the first phrase to mean "interim earnings not in excess of those earned with reasonable diligence." In this case, because the trial court found that "reasonable diligence" did not require that Bing do more than hold his city driver job, his moonlight earnings would not be "interim earnings" within the statutory meaning. To interpret this section otherwise would allow Bing to recover less in his lawsuit than a discriminatee who did not moonlight. The ultimate effect, says the Government, is to penalize the discriminatee who is energetic and works more hours than the "reasonable diligence" standard requires.

As a matter of policy the Government's argument is strong, and we find it tempting. Unfortunately, however, we find that we cannot escape the statute's clear admonition even though we may disagree with its policy. The phrases "interim earnings" and "amounts earnable with reasonable diligence" appear to establish two separate and unrelated standards for computing back pay. The statute does not say "reasonable interim earnings" or "interim earnings earned with reasonable diligence." It says simply "interim earnings . . . shall operate to reduce the back pay otherwise allowable."

 We are left with the problem of deciding whether Bing's moonlight earnings are interim earnings.

We will not attempt a definitive construction of the term "interim earnings." "Interim" is synonymous with temporary or provisional. See Webster's Third New International Dictionary (1964). If a supplemental or moonlight job is one that the discriminatee cannot perform when he wins his new position, the supplemental job is necessarily temporary, provisional or "interim." By contrast, if one can hold his supplemental job and his desired full time job simultaneously and there is reason to believe he will do so, the supplemental job assumes a permanent rather than interim nature. Those earnings would be independent of the position sought and should not be taken into account in back pay calculations. Since the trial court found that it would be impossible for Bing to moonlight while working sixty to one hundred hours a week as a road driver, it correctly concluded that his moonlight earnings were interim and deductible from his back pay award. They were earnings that could continue only until he won his new position.

This approach treats Bing equitably. If he had been a road driver he would have had to work sixty to one hundred hours per week. The employer's wrongful refusal to allow his transfer put Bing in a job that required only forty hours each week, leaving him an additional twenty to sixty hours. He put part of this time to use by working at various driving jobs. His hours were fewer and his earnings were greater than the hours and earnings of a road driver from April 11, 1966 to December 31, 1971.

While the trial court was correct in deducting all of Bing's moonlight earnings from the amount he would have earned as a road driver, it calculated his projected OTR earnings incorrectly. As we understand the trial court's calculations, it allowed no earnings for the nineteen-month layoff period. It seems blatantly unfair to subtract Bing's supplementary earnings, which continued through the layoff period, from his hy-

pothetical road earnings, which had been reduced by the assumption that he would have earned nothing during the layoff period. It seems quite possible to us that he may have moonlighted during the period when road drivers were laid off. Any such earnings he would have made should be added to the trial court's estimate of his road driver earnings. Accordingly, on remand we direct the trial court to determine whether Bing could and would have made supplementary earnings during the layoff period. If the trial court finds that he would have had supplementary earnings during the layoff period, it must recalculate his back pay to take them into account.

By way of summary, we hold that this was an effective class action, and that the notice to the class properly alerted the class members to their opportunity to bring forth individual claims. The notice identified the affected members of the class who deserved individual relief in this action. Those members were Bing, Johnson, Melson, Hicks, and Stroud. All but Bing had received the relief to which they are entitled. Bing's seniority must be adjusted to reflect an April 2, 1964 effective date. His back pay must be recalculated from July 2, 1965. The court below must determine if, as a hypothetical laid off road driver he would have had supplemental earnings, and it must adjust his back pay to reflect any such earnings. We affirm the injunctive relief granted by the trial court.

Local Union No. 728 shall bear the costs it incurred in this appeal. Appellee Roadway shall pay all other costs. Bing's attorney is entitled to an award for fees earned in the prosecution of this appeal pursuant to 42 U.S.C. § 2000e–5(k); the award is to be paid by Roadway. The matter is remanded to the district court in order that it may determine an appropriate fee award.

The decree of the district court is modified in part, vacated and remanded in part, and affirmed in part.