**J. C. MILLER et al.**

**v.**

**MISSOURI PACIFIC RAILROAD COMPANY and Brotherhood of Locomotive Engineers,**

**Herman W. Simpson et al., Intervenor,**

**MISSOURI PACIFIC RAILROAD COMPANY, Third-Party Plaintiff,**

**v.**

**UNITED TRANSPORTATION UNION (E) et al., Third-Party Defendants.**

**Civ. A. No. 18675.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.
March 18, 1974.

Jack W. Caskey, Lake Charles, La., for plaintiffs.

Everett R. Scott, Jr., Larry A. Roach, Lake Charles, La., for defendants.

Clarence M. Small, Jr., Birmingham, Ala., for third-party defendants.

Stuart M. Nelkin, Houston, Tex., for intervenors.

EDWIN F. HUNTER, Jr., Chief Judge:

Twenty-eight railroad locomotive engineers filed action in State Court to enjoin Missouri Pacific Railroad Company from implementing a collective bargaining agreement with the Brotherhood of Locomotive Engineers entered into · on December 7, 1972. This particular Agreement concerned itself with the entitlement of other railroad locomotive engineers to "antecedent seniority" upon the Seniority Roster of the Railroad's DeQuincy Division.

The Railroad removed to this Court and named the Brotherhood of Locomotive Engineers as an additional defendant The United Transportation Union (E), representing the craft of locomotive firemen, was named third party defendant by the Railroad. The individual locomotive firemen who could be affected by the agreement were notified of the lawsuit by the plaintiffs pursuant to Order of Court.

Herman W. Simpson and three other individual non-plaintiff locomotive engineers who had qualified and were promoted from locomotive firemen on the same Division intervened as defendants.

After trial, the Court, having heard the evidence and stipulations of counsel, finds the facts and states the conclusions of law, as follows:

## FINDINGS OF FACT

**1.**

All locomotive engineers employed by the Railroad on its DeQuincy Division at all times pertinent were represented for collective bargaining purposes by the Brotherhood of Locomotive Engineers.

**2.**

All locomotive firemen employed by the Railroad on its DeQuincy Division at all times pertinent were represented for collective bargaining purposes by the United Transportation Union (E).

**3.**

The Railroad is a common carrier subject to the Railway Labor Act.

**4.**

The DeQuincy Division of the Missouri Pacific Railroad Company extends generally from Houston, Texas to New Orleans, Louisiana, and is composed of four subdivisions which derived their boundaries historically from four separate railroads which had been earlier merged into the parent.

**5.**

Prior to 1964, on this Division, all locomotive engineers were white. On three of the subdivisions of this Division, all locomotive firemen were black, and black people were not eligible for membership in the Brotherhood of Locomotive Engineers.

**6.**

The collective bargaining agreements for the respective crafts on the DeQuincy Division contained no provisions for the qualification and promotion of firemen to engineer.

**7.**

After 1964, black firemen were permitted to qualify as engineers and four of them, in fact, did. These four were Herman W. Simpson, Seymour Pullam, Isiah Buck and Charles Fontenot, who have appeared in this lawsuit as Intervenors.

**8.**

These four promoted firemen were originally awarded seniority dates on the engineers' roster pursuant to existing agreements dating back to March 1, 1929—beginning with their first trip after qualifying and their respective seniorities appeared on the January 1, 1972 roster thusly:

| | As Fireman | | As Engineer | |
|---|---|---|---|---|
| H. W. Simpson | # 3 | 8–04–41 | #36 | 9–30–71 |
| Seymour Pullam | #15 | 10–16–42 | #38 | 10–01–71 |
| Isiah Buck | #25 | 9–30–49 | #x | x |
| Charles Fontenot | #26 | 8–23–53 | #x | x |

x added as of 8–17–72

**9.**

As of January 1, 1972, there were 27 black firemen holding seniority as firemen on the roster for those three subdivisions. Their firing seniority dates ranged from December 22, 1929 through August 23, 1953, but by December, 1972, the roster had been reduced to 22 by retirements and deaths.

**10.**

Under date of December 7, 1972, the Railroad and the Brotherhood on behalf of the craft of locomotive engineers on this Division entered into the agreement which is at issue in this litigation. That agreement modified particular portions of basic March 1, 1929 collective bargaining agreement in effect between the Railroad and the Brotherhood. Pertinent provisions of the December 7, 1972 agreement read thusly:

"Section 1.

It is understood and agreed that all Firemen shown on the Seniority Roster of "Locomotive Firemen," DeQuincy Division, which roster is dated January 1, 1972, who do not have a date as Locomotive Engineer and who hired as Firemen prior to November 1, 1972, will be afforded the opportunity to qualify as Locomotive Engineer. When so qualified as Locomotive Engineer, they will be accorded a date as Engineer on the DeQuincy Division Engineers' Seniority Roster and such date shall be three (3) years following their date as a Fireman on the DeQuincy Division."

"Section 3.

Those DeQuincy Division Locomotive Firemen, above referred to, who desire to become Locomotive Engineers in accordance with this Agreement will, on or before February 1, 1973, so signify, in writing, on the form attached hereto and made a part hereof. Each such DeQuincy Division Fireman shall thereafter and within six months subsequent to February 1, 1973, be afforded one (1) opportunity to pass the required qualifying examinations. Upon successful completion of the required examination, he will be dated as Engineer in accordance with Section 1 of this Agreement. Upon failure to successfully pass the required examination, he will not be penalized by any loss of or reduction in any rights as Fireman on the DeQuincy Division."

"Section 4.

DeQuincy Division Firemen who become entitled to dates as Engineer in accordance with the terms of this Agreement will not initially exercise their seniority so as to displace DeQuincy Division Engineers on other than "outlying" Engineers' positions unless and until such positions are rebulletined or become vacant under the terms of the Engineers' Agreement. "Outlying Engineers' Positions" is understood to mean the extra board and all Engineer positions on the DeQuincy Division, excepting those which have DeQuincy as their home terminal. Thereafter Engineer's seniority date shall govern in accordance with B. of L. E. Schedule Rules. The foregoing, in respect to date as Engineer and exercise of seniority, shall apply to Engineer-Firemen H. W. Simpson, S. Pullam, I. Buck and C. Fontenot, each of whom has earlier been accorded a date as Engineer on September 30, 1971, October 1, 1971, August 17, 1972 and August 17, 1972, respectively."

**11.**

Under the same December 7, 1972 date, the Railroad and United Transportation Union (E) on behalf of the craft of locomotive firemen on this Division, entered into an agreement also modifying their basic collective bargaining agreements to award a comparable "antecedent seniority" as firemen to all engineers who had no firing seniority on the Division. This antecedent seniority as firemen corresponded with the engineers' seniority date as engineers.

**12.**

Prior to this Agreement, most of the locomotive engineers held no seniority as firemen on this Division because most of them had been hired as engineers from other railroads or other divisions of this railroad.

**13.**

The Agreements dated December 7, 1972 were made in response to demands on behalf of the four black promoted engineers and the remaining eligible black firemen and under the threat of litigation.

**14.**

■ In the face of these demands, the Railroad had an affirmative duty under the Railway Labor Act, 45 U.S.C. Sec. 151 et seq., First and Second, the Civil Rights Act, 42 U.S.C. Sec 1981 et seq., particularly 2000e–2(a), (c), and the Constitution to negotiate with the statutory bargaining representatives of these crafts and to devise and implement some seniority system to make up for the past discriminations.

**15.**

The Brotherhood and the Union were equally under the same affirmative duty to act because, by law, they represent all members of their respective crafts on this Division, and both of the crafts then contained both blacks and whites.

**16.**

Each the Railroad, the Brotherhood and the Union entered into and concluded the negotiations that culminated in these December 7, 1972 Agreements fairly, impartially, and in good faith and each were well represented by competent, well-advised and duly authorized officials.

**17.**

The Agreements have now been fully implemented and performed, eligible black firemen have been afforded the opportunities for promotion to locomotive engineers pursuant to the Section 3 quoted above, and no other persons may attain "antecedent seniority" in either of the crafts under the provisions of either Agreement dated December 7, 1972.

**18.**

■ There is no evidence that the Agreements under attack were negotiated in bad faith nor with hostile discrimination towards any persons. The results of the Agreements, though necessarily adverse to some persons, likewise, do not support the contentions that the Agreements themselves were in any manner entered into arbitrarily, capriciously or in violation of fair representation principles.

## CONCLUSIONS OF LAW

In Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), the United States Supreme Court said:

"Congress, in enacting the Railway Labor Act and authorizing a labor union, chosen by a majority of a craft, to represent the craft, did not intend to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft without imposing on it any duty to protect the minority."

. . . . . .

"So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft."

174

■ Further, this duty extended to representing both non-member and minority members of the craft without hostile discrimination, fairly, impartially and in good faith.

■ The racial minority of a craft, in absence of any available administrative remedy, is invested with the right to enforce the union's duty and may resort to the Courts for equitable relief from illegal discriminatory representation. See Graham v. B. of L. F. & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949).

The United States Court of Appeal for the Fifth Circuit has more recently found in United States v. Jacksonville Terminal Co., 451 F.2d 418 (1971), cert. den. 406 U.S. 906, 92 S.Ct. 1607, 31 L. Ed.2d 815 (1972) that the Federal Courts, under the Railway Labor Act, have had the power to protect employees against invidious discrimination and that this same power has been identically exercised under the National Labor Relations Act. Further supplementing each of these two statutes is Title VII of the Civil Rights Act, which has expanded the scope of judicial inquiry and augmented the power of remedial relief in cases involving discriminatory employment practices based upon race, color, religion, sex or national origin.

In *Jacksonville Terminal*, the Court held:

". . . that continued use of the craft and class seniority systems to restrict the transfer and promotion opportunities of incumbent black employees at the Terminal is neither bona fide nor a business necessity: such systems necessarily exclude blacks from jobs for which they might otherwise qualify. 42 U.S.C.A. § 2000e–2(a), (c). The Act imposes upon employers—with the assistance and cooperation of labor representatives—an affirmative duty to devise and implement pertinent objective criteria for determining what applicants for promotion or transfer are qualified to fill particular vacancies."

Refining the "pertinent objective criteria" further, this same Court in Bing v. Roadway Express, Inc., 485 F.2d 441 (5 Cir. 1973) followed the "rightful place" theory from its prior pronouncements in Local 189, United Papermakers and Paperworks v. United States, 416 F.2d 980 (5 Cir. 1969), cert. den. 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). As in *Local 189, United Papermakers*, the crux of the problem is how far the employer must go to undo the effects of past discrimination. It is answered in *Bing* thusly:

"Thus the rightful place theory dictates that we give the transferring discriminatee sufficient seniority carryover to permit the advancement he would have enjoyed, and to give him the protection against layoffs he would have had, in the absence of discrimination. How much seniority the transferee deserves should be determined by the date he would have transferred but for his employer's discrimination."

In the factual circumstance of *Bing*, the transferee's road unit seniority was dated from the date they possessed the experience necessary to qualify them to enter the road driving unit.

■ In the instant case, the Railroad and the Unions, admittedly with the *Jacksonville Terminal* and other decisions at the very conference table with them, arrived at a pertinent objective criterion that these black firemen would carry over with them into engine service "antecedent seniority" roughly backdated to their equivalent dates for completion of the apprentice or minimum learning time required of firemen elsewhere on the Railroad's own system and on other lines for promotion to engineer.

Whatever uncertainties may exist, one thing is unmistakably clear: the agreement is not illegal and does not justify the intervention of equitable relief to enjoin its implementation.

The petition for a writ of injunction must be denied. The case is dismissed.