[No. 20301-4-II. Division Two. April 3, 1998.]

SHAROLYN ELIZABETH BASS, *Appellant*, v. THE CITY OF TACOMA, *Respondent*.

*Ralph Seeley* and *Paul A. Lindenmuth* of *Law Offices of Neil J. Hoff*, for appellant.

*James W. Feltus* and *K. Michael Jennings* of *McGavick, Graves, Beale & McNerthney*, for respondent.

MORGAN, J. — Sharolyn Elizabeth Bass sued the City of Tacoma (City) for employment discrimination. The trial court granted summary judgment in favor of the City. Taking the evidence in the light most favorable to Bass,[1] we affirm.

In August 1987, Bass suffered a head injury while working at a delicatessen. The injury resulted in permanent brain damage. It is undisputed that she has been disabled ever since.

In 1991, Bass qualified for vocational rehabilitation

---

[1] *Hillhaven Properties Ltd. v. Sellen Constr. Co., Inc.*, 133 Wn.2d 751, 758, 948 P.2d 796 (1997).

through the Department of Labor and Industries (DLI), and DLI hired a private consultant named Carol Williams. In the summer of 1991, Williams arranged for Bass to obtain on-the-job retraining with the City.

In September 1991, Bass and the City entered into a written "On The Job Training [OJT] Agreement." Signed by Bass, the city attorney, the city manager and the city clerk, this OJT agreement stated that the City would train Bass 20 hours per week for a 50-week period (October 11, 1991 to September 22, 1992).[2] Bass was not to receive salary or benefits from the City; rather, she would be paid by DLI. She would organize the City's backlog of domestic violence cases and revise procedures so that incoming cases would be handled more expeditiously. Her title would be "Domestic Violence Coordinator/Specialist."[3]

As originally proposed, the OJT agreement would have provided, "If the workload remains constant and an opening occurs for which this worker is the best qualified candidate, our intent is to hire this individual."[4] At the City's request, however, this provision was deleted. As executed, the OJT agreement provided, "The City of Tacoma does not guarantee employment to [Bass] beyond the 50 weeks training period and reserves the right to terminate for cause during the 50 weeks of training according to [its] regular standards, policies, and practices."[5]

When the OJT agreement first took effect, the City designated Michael D. Smith, an assistant city attorney, to be Bass' supervisor. He gave her high ratings in performance reviews dated August and November 1991, concluding that her work was "[e]xcellent in all respects!"[6] On November 25, 1991, he added a sentence to the OJT agreement which stated, "In the event of a job opening in this field for which this worker is qualified, she should be given

[2]Clerk's Papers at 29-32.

[3]Br. of Appellant at 4.

[4]Clerk's Papers at 31.

[5]Clerk's Papers at 31.

[6]Clerk's Papers at 164-67.

due consideration thereof in accordance with the City Civil Service and Personnel rules."[7]

Before the end of 1991, Bass' supervisor became Kimberly Rendish, another assistant city attorney. Rendish gave Bass high ratings in subsequent performance reviews.

In August 1992, Bass' nominal supervisor became Heidi Horst, another assistant city attorney. However, Horst asked Rendish to continue to supervise Bass, and Rendish did so in actual practice. In November 1992, Horst gave Bass a negative performance review.

Meanwhile, in August 1992, the city attorney was told that domestic violence victims were complaining about Bass. He responded by convening a meeting with Smith and Williams. According to him, he

> requested this meeting for the sole purpose of terminating the on-the-job training agreement due to problems with Ms. Bass' training performance. During this meeting [he] agreed to continue the training through the term of the training agreement . . . but only with the absolute understanding that it would terminate on that date. There was absolutely no discussion, general or otherwise, regarding the possibility of employment for Ms. Bass.[8]

According to Williams, however, the city attorney asserted that "in no way was he going to consider [Bass] for employment." He said "he had had a brain-injured attorney that he had to put up with for a number of years, and he wasn't going to do that again."[9]

After the meeting, as Williams and Smith were walking back to Smith's office, Williams commented, according to her, that "it was amazing . . . with the new [Americans with Disabilities Act] in place that [the city attorney] would

---

[7]Clerk's Papers at 34; Clerk's Papers at 244. Without so holding, we assume Smith had authority to contract on behalf of the City.

[8]Clerk's Papers at 73; Clerk's Papers at 44; Clerk's Papers at 177-78.

[9]Clerk's Papers at 178-79; see also Clerk's Papers at 207.

say such a thing."[10] Smith replied that "the City of Tacoma doesn't care about the ADA."[11]

Bass left the city attorney's office on September 22, 1992, when the OJT agreement expired. She did not submit an application for regular city employment. Nor, as far as the record shows, did the City have an open position for which she might have been qualified. She was aware that the City might fund a new paralegal position at the end of the year, because she had heard Smith discuss that at a staff meeting.

In December 1992, the Tacoma City Council created and funded two new paralegal positions. Each was an "unclassified and non-civil service position, subject to appointment by and serving at the pleasure" of the city attorney.[12] Each "requir[ed] specific paralegal certification/training."[13] The City did not solicit an application from Bass, nor did it advertise for applications. Bass did not apply for the new jobs because she thought that "a formal application would be futile."[14] By then, she knew that "the City Attorney . . . had stated unequivocally that [Bass] would not be hired because of [her] disability," and that the city attorney "had absolute discretion concerning who to hire to fill such a position."[15]

In December 1992, the City filled one of the new positions by hiring Susan Wittenberg, "an existing employee of the City Attorney's office."[16] In January 1993, the City filled the other new position by hiring Elena Crouch, who

---

[10]Clerk's Papers at 182.

[11]Clerk's Papers at 182.

[12]Clerk's Papers at 76. Bass claims that city regulations mandated the city attorney to consider her for employment even though she had not submitted an application for full-time permanent employment. Having reviewed the regulations she cites, we are unaware of any that so provides.

[13]Clerk's Papers at 72. No one disputes that paralegal certification/training was a bona fide occupational qualification.

[14]Clerk's Papers at 113.

[15]Clerk's Papers at 113.

[16]Clerk's Papers at 200.

had been working for the City as a contract legal intern.[17] According to Bass, Crouch essentially "took over [Bass'] job; she sat at the same desk, attempted to perform the same tasks, used the same equipment, and so forth."[18]

On February 12, 1994, about a year and a half after the OJT agreement expired, Bass applied, for the first time as far as the record shows, for permanent full-time employment with the City. Her application informed the City, also for the first time, that she had completed paralegal training. The record does not show that the City had a paralegal position open at that time.

Bass sued the City in May 1994, alleging claims for breach of contract and disability discrimination. The City sought summary judgment a year or so later. Although Bass "stipulate[d] to the dismissal of the breach of contract claim,"[19] she resisted dismissal of the discrimination claim.

On August 18, 1995, the trial court orally granted summary judgment on the discrimination claim. It held, according to Bass, (1) that "[t]here was no job opening at the time of the expiration of [Bass' OJT] contract, so the [City] had no duty to offer her a job"; and (2) that Bass "did not formally apply for a job, so the [City] could not be held liable for [its] failure to offer her a job."[20] After denying Bass' motion for reconsideration, the court signed a written order of dismissal.

■ Preliminarily, we agree with the trial court that the City had no duty to offer Bass a job when, in September 1992, the OJT agreement expired. In addition to Bass' not having applied for employment, the City did not then have

---

[17]Bass makes much of Crouch's alleged friendship with certain City officials. Assuming those allegations to be true, they are immaterial to our analysis.

[18]Clerk's Papers at 57-58.

[19]Clerk's Papers at 51.

[20]Clerk's Papers at 98.

a job opening, and it was not required to create a job for Bass.[21]

Still preliminarily, we agree with the trial court that the City had no duty to offer Bass a job when, in February 1994, she first applied for regular full-time employment. The record does not show that the City had a job open at that time, and it was not required to create a job for Bass.[22]

The only real issue is whether the City unlawfully discriminated by not offering Bass a job when, in December 1992-January 1993, it hired Wittenberg and Crouch. Bass raises two basic questions: (1) Did the City discriminate by *commission*—in other words, by making an unlawful decision not to hire Bass? (2) Did the City discriminate by *omission*—in other words, by unlawfully omitting to make a decision on whether to hire Bass?

■ If Bass is to prevail on her claim that the City made an unlawful decision not to hire her, she "must prove that [a sensory, mental, or physical disability] was a 'substantial factor' in an employer's adverse employment decision."[23] At a minimum, then, she must prove (1) that the City made an adverse employment decision; (2) that she was disabled; (3) that her disability was a substantial factor in the City's adverse employment decision; and (4) that she was, or with reasonable accommodation would have been, able and qualified to perform the essential functions of the job.[24]

■ ■ The first of these elements is key here. Can Bass

---

[21]*Dean v. Municipality of Metro. Seattle-Metro*, 104 Wn.2d 627, 634, 708 P.2d 393 (1985).

[22]*Dean*, 104 Wn.2d at 634.

[23]*Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 310, 898 P.2d 284 (1995); RCW 49.60.180(2).

[24]In *Jane Doe v. Boeing Co.*, 121 Wn.2d 8, 16, 846 P.2d 531 (1993), the Supreme Court described the same elements using different terms. It said that the elements of a handicap discrimination claim are "(1) the presence of an abnormal condition, and (2) employer discrimination against the employee plaintiff because of that condition." Br. of Appellant at 15; Reply Br. of Appellant at 6. It is apparent, however, that "abnormal condition" includes a disability, and that "employer discrimination" means an adverse employment decision in which the abnormal condition (i.e., disability) was a substantial contributing factor.

produce evidence sufficient to support a finding that the City actually made an employment decision adverse to her? In more specific terms, can she produce evidence sufficient to support a finding that the City actually decided not to hire her? The answer is no, even when we take the evidence in the light most favorable to Bass. As the trial court correctly noted, the City did not have an employment application from Bass in December 1992 or January 1993. Thus, it had no occasion to make, and there is no evidence that it did make, a decision not to hire her.[25]

Attempting to excuse her failure to submit an employment application, and thus her inability to prove that the City made an adverse employment decision, Bass claims that she was not required to apply for employment because any application "would have been futile."[26] She can prevail, she says in effect, by showing that *if* she had submitted an employment application, the City *would have* discriminated against her. At bottom, she asserts that she can base a cause of action for discrimination on the City's announced intent to discriminate, even though the evidence fails to show that the City ever put that intent into action by making an adverse employment decision.

In *International Bhd. of Teamsters v. United States*,[27] the United States Supreme Court said:

> The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
>
> If an employer should announce his policy of discrimination

With respect to the fourth element, *see Dean*, 104 Wn.2d at 639. We do not hold that this list of elements is (or is not) exclusive of all others.

[25]And, we observe in passing, it is logically impossible for disability to have been a substantial factor in this nondecision.

[26]Br. of Appellant at 23.

[27]431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).

by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.[28]

The court also noted that lower federal courts had said, in earlier cases, "that a nonapplicant can be a victim of unlawful discrimination entitled to make-whole relief when an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him."[29]

Assuming without holding that *Teamsters* represents the law of Washington, it does not control here. In *Teamsters*, the plaintiffs proved discriminatory employment decisions pertaining to promotions, seniority, or the like. The question then became who should share in the relief: only those who had applied for a promotion, seniority, or the like, or also those who had been deterred from applying because they knew about the employer's discriminatory employment practice? The courts extended relief to those who had been deterred, necessarily holding in the process that discriminatory treatment of a plaintiff can be inferred from a pattern of discriminatory conduct against others in the same protected class. The courts did not go so far as to

---

[28]431 U.S. at 365-66.

[29]*Teamsters*, 431 U.S. at 367 (citing *Acha v. Beame*, 531 F.2d 648, 656 (2d Cir. 1976); *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 231-33 (4th Cir. 1975); *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 451 (5th Cir. 1973); *United States v. N.L. Industries, Inc.*, 479 F.2d 354, 369 (8th Cir. 1973)).

hold that discriminatory treatment of a plaintiff can be inferred from an announced intent to discriminate, unaccompanied by an actual employment decision adverse to the plaintiff or anyone else in the plaintiff's protected class. Bass asks us to so hold here, but we decline the invitation.

Having concluded that the City did not make an unlawful decision not to hire Bass, we turn next to whether it unlawfully *omitted* to make a decision on whether to hire Bass. At least in her opening brief, Bass seems to argue that if such an omission occurred, it violated a duty of reasonable accommodation that the City owed to her in December 1992 and January 1993.[30]

Initially, Bass relies on the OJT agreement that expired on September 22, 1992. She claims that while the OJT agreement was in effect, the City owed her a duty to reasonably accommodate her disabilities; that after the OJT agreement expired, the City continued to owe her such a duty; and thus that the City was obligated to consider her for employment when, in December 1992 and January 1993, it created the two new paralegal jobs.

▇ Without so holding, we assume that an employer's duty to accommodate does not end when the employer terminates the employee because the employee's handicap renders the employee unable to perform the job.[31] We hold, however, that an employer's duty to accommodate does end when the employment relationship simply expires according to its own, previously-agreed-upon terms. That is what happened here, and any duty to accommodate that the City might otherwise have had was not in effect after September 22, 1992.

---

[30]It is difficult to discern whether Bass is maintaining or abandoning this claim in her reply brief. *See* Reply Br. of Appellant at 6, claiming that the elements listed in *Dean v. Municipality of Metro. Seattle-Metro* are "applicable to handicap accommodation cases as opposed to the instant case which concerns a claim of handicap discrimination in the employment context under the theory of disparate impact."

[31]In this case, we have no occasion to agree or disagree with *Wheeler v. Catholic Archdiocese*, 65 Wn. App. 552, 561-63, 829 P.2d 196 (1992), *reversed in part on other grounds*, 124 Wn.2d 634, 880 P.2d 29 (1994).

 Additionally, Bass seems to argue for a duty of reasonable accommodation even without the OJT agreement. Axiomatically, however, an employer's duty of reasonable accommodation is limited to job applicants and employees.[32] Indeed, it would be absurd to extend this duty to others in the public who have never expressed interest in the job. Bass first applied for regular City employment in February 1994, and thus the City did not owe her a duty of accommodation in December 1992 or January 1993.

We conclude that the evidence in this case will not support a claim for unlawful discrimination, either by commission or omission. Hence, the trial court did not err by granting a summary judgment of dismissal.

Affirmed.

BRIDGEWATER, A.C.J., and ARMSTRONG, J., concur.

After modification, further reconsideration denied July 10, 1998.

Review denied at 137 Wn.2d 1005 (1999).

---

[32]*See* AM. JUR. 2D NEW TOPIC SERVICE, AMERICANS WITH DISABILITIES ACT: ANALYSIS AND IMPLICATIONS § 61 (1992) ("It is a discriminatory employment practice for a covered entity not to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability *who is an applicant or employee*, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . .") (emphasis added); *see also* Robert F. Koets, Annotation, *When Must Specialized Testing, Training, or Other Work Procedures Be Provided for Benefit of Qualified Disabled Employee or Applicant to Fulfill Employer's Reasonable Accommodation Requirement*, 127 A.L.R. FED. 559 (1995) (emphasis added); William G. Phelps, Annotation, *What Constitutes Reasonable Accommodation of Otherwise Qualified Employee or Applicant Who Is Disabled by Drug or Alcohol Addiction*, 122 A.L.R. FED. 111 (1994) (emphasis added); Robert F. Koets, Annotation, *When Must Specialized Equipment or Other Workplace Modifications Be Provided to Qualified Disabled Employee or Applicant as Reasonable Accommodation*, 125 A.L.R. FED. 629 (1995) (emphasis added).