John/Jane DOE, 1-13 by and through Mr./Mrs. DOE SR. No.'s 1-13 as natural guardians on and behalf of those similarly situated, Plaintiffs-Appellees,

v.

Jeb BUSH, in his official capacity as Governor of the State of Florida, Kathleen Kearney, in her official capacity as Secretary of the Department of Children and Family Services, et al., Defendants-Appellants.

Nos. 99-14590, 00-12097.

United States Court of Appeals,

Eleventh Circuit.

Aug. 14, 2001.

Appeals from the United States District Court for the Southern District of Florida. (No. 92-00589-CV-WDF), Wilkie D. Ferguson, Jr., Judge.

Before ANDERSON, Chief Judge, CARNES, Circuit Judge, and NANGLE[*], District Judge.

CARNES, Circuit Judge:

State officials charged with the administration of the Medicaid program in Florida appeal two separate orders arising out of the same litigation. The first appeal is from a contempt order entered on October 7, 1999, for their alleged failure to comply with the injunctive relief ordered in a 1996 final judgment involving the state's Medicaid program. The second appeal is from a class certification order entered on February 11, 2000, approximately three months after the defendants filed their notice of appeal from the contempt order and nearly four years after the entry of final judgment in the case. We consolidated the two appeals.

This litigation has been ill-fated since the district court entered its terse final judgment in 1996. The scope and reach of that judgment has been a source of contention between the parties leading to this point. There are a number of issues, all of which we will discuss in the course of this opinion. For the present introductory purposes, suffice it to say that we have concluded that the district court's finding of contempt, as well as its belated entry of the class certification order, are due to be reversed, and the case remanded to the district court which will then have an opportunity to more clearly define the obligations it intends to impose upon the defendants.

## I. PROCEDURAL BACKGROUND

In 1992, thirteen unnamed developmentally disabled individuals ("plaintiffs") who had been placed

---

[*]Honorable John F. Nangle, U.S. District Judge for the Eastern District of Missouri, sitting by designation.

on waiting lists for entry into intermediate care facilities ("ICF")[1] brought a § 1983 action against officials of the Florida Department of Health and Rehabilitative Services[2] ("defendants"). The suit alleged that defendants were allowing eligible individuals to languish on waiting lists for Intermediate Care Facilities for the Developmentally Disabled services ("ICF/DD services") for years in violation of the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* In 1996, the district court granted summary judgment in favor of plaintiffs, determining that 42 U.S.C. § 1396a(a)(8) requires that defendants provide ICF/DD placement to all eligible individuals with "reasonable promptness." Accordingly, in a separate order entered on August 28, 1996, the district court entered the following final judgment:

> ORDERED AND ADJUDGED that Defendants' shall, within 60 days of the date of this Order, establish within the State's Medicaid Plan a reasonable waiting list time period, not to exceed ninety days, for individuals who are eligible for placement in ICF/DD institutional care facilities.

On appeal, this Court affirmed the district court. *See Doe v. Chiles,* 136 F.3d 709 (11th Cir.1998).

### A. THE CONTEMPT ORDER

On June 16, 1998, two months after this Court affirmed the district court's final judgment order, plaintiffs filed a motion for contempt arguing that defendants had not taken any steps to comply with the final judgment. On November 4, 1998, the district court conducted a show cause hearing on whether defendants should be held in contempt. At the hearing, defendants estimated that there were 600 developmentally disabled individuals in need of ICF/DD services who were not receiving them. That number represented an estimate of the individuals who had requested or were likely to request ICF/DD services, and was not based on individualized eligibility assessments.[3]

Following the show cause hearing, on November 10, 1998, the district court determined that defendants were not complying with the final judgment, but it did not hold them in contempt. Instead, the

---

[1]ICF's are institutions that provide 24-hour residential care and services to severely disabled individuals with developmental disabilities. *See* 42 U.S.C. § 1396a(a)(10)(C)(iv); Fla. Admin. Code § 59G-4.170(d). ICF's are reimbursed for care provided to residents through the joint state-federal Medicaid program. Fla. Admin. Code § 59G-4.170(5)(a).

[2]In 1996, the Department of Health and Rehabilitative Services was redesignated as the Department of Children and Family Services. *See Doe v. Chiles,* 136 F.3d 709, 711 n. 1 (1998). In November of 1998, Jeb Bush was elected Governor of Florida. He subsequently replaced all of the individuals who had been the named defendants in the original action. Upon defendants' motion for substitution of parties, the case style was changed to reflect these new defendants.

[3]Defendants now argue that the 600 number was an inaccurate estimate that included people who were seeking any "alternative residential placements," and that they never identified any specific individuals who were actually in need of ICF/DD services.

district court entered an order that allowed additional time to complete "specific acts of compliance." The defendants were ordered to provide Medicaid services to the "named members of the class," to identify and locate for immediate delivery of ICF/DD services the 600 persons whom defendants had estimated were eligible for those services, and to fully comply with the final judgment "as to all members of the numbered class."

On January 11, 1999, defendants filed their plan of compliance, setting forth the steps they had taken or intended to take in order to comply with the 1996 final judgment. On May 24, 1999, the district court conducted a three day hearing in order to determine whether the defendants were complying with the 1996 judgment. On October 7, 1999, the court held the defendants in contempt for failure to comply with that final judgment and it fined them $10,000 per day "until a comprehensive plan, which comports with the letter and spirit of the [final judgment] is submitted, ready for implementation." The validity of the contempt order is the subject of the first half of the consolidated appeal.

## B. THE CLASS CERTIFICATION ORDER

Plaintiffs originally captioned their complaint as "Civil Complaint (class action)." The complaint stated repeatedly that it was filed on behalf of the named plaintiffs and those "similarly situated." On July 1, 1992, plaintiffs filed a motion to certify the class. The magistrate judge filed a report and recommendation ("R&R") on the certification issue on August 26, 1996, recommending that plaintiffs' motion to certify the class be granted. The R&R described the scope of the class as follows:

> all developmentally disabled individuals in the State of Florida who are entitled to Intermediate Care Facilities for the Mentally Retarded ("ICF/MR") placement but have not received a placement with reasonable promptness.

Although the district court received the R&R two days prior to entering final judgment, and acknowledged as much, the court entered final judgment without addressing the class certification issue. In that same final judgment order, the district court denied as moot all pending motions, including presumably, plaintiffs' motion for class certification. The district court did not address the class certification issue again before entering its contempt order in 1999.

In their appeal of the district court's October 7, 1999 contempt order, one of the arguments the defendants made was that no class had ever been certified. Aware of that, the district court, on February 11, 2000, *sua sponte* and without notice to the parties, entered an order adopting the magistrate's four-year-old R&R and granting class certification. The district court's decision to certify a class at that late date was motivated by the defendants' appeal of the contempt order, as the court's Order Granting Class Certification

acknowledged: "In a pending appeal the defendants have challenged the breadth of an order on grounds that it compels relief for a class of individuals beyond the named plaintiffs. This Order on class certification is germane to that issue and should be added to the record on appeal as a supplement." The district court modified the class that was originally proposed in the R&R to include:

> Medicaid eligible individuals with developmental disabilities who have formally requested placement in an Intermediate Care Facility ("ICF/DD") and for whom the placement would be medically and otherwise appropriate but who have not received a placement with reasonable promptness. Specifically included in this class are the approximate 600 individuals the State of Florida had identified as eligible for ICF/DD placement who have been awaiting placement for more than 90 days. (footnote omitted).

The validity of the class certification order is the subject of the second half of the consolidated appeal.

## II. DISCUSSION: THE CONTEMPT ORDER

### A. THE DEFENDANTS' CONDUCT

Before discussing the district court's holding that defendants were in contempt of its 1996 final judgment, we need to set out in some detail precisely what the defendants did following the issuance of the 1996 final judgment and this Court's mandate affirming that judgment, *see Chiles,* 136 F.3d 709.

### 1. *Defendants Amend the Florida State Medicaid Plan*

On April 27, 1998, the Federal Health Care Financing Administration approved an amendment, which had been submitted by defendants in response to the final judgment, to the Florida State Medicaid Plan. Under the amended plan, an applicant is not deemed eligible for ICF/DD services unless it is first determined that such services are medically necessary. Specifically, the plan provides:

> *Intermediate Care Facility for the Developmentally Disabled (ICF/DD) Service*

> Limitations

> (1) The Recipient's need for ICF/DD services must be determined by the agency's designee[4] based on medical necessity.

> (2) The agency's designee will maintain a waiting list for persons who have been determined by the agency's designee to be eligible for, require and have chosen ICF/DD placement. The time from placement on the waiting list until admission to an ICF/DD for such persons will not exceed 90 days.

*See* Florida Medicaid Plan, Attachment 3.1-A(15)(1).[5]

---

[4]The agency's designee is the Department of Children and Family Services.

[5]The previous incarnation of this provision of Florida's Medicaid Plan provided:

> *Services in an Intermediate Care Facility for the Mentally Retarded*

> The recipient's need must be determined by the agency based on medical

Medical necessity is defined in Florida Administrative Code § 59G-1.010(166), which provides that in order for a service to be considered "medically necessary," it must:

(a) Meet the following conditions:

1. Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;

2. Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;

3. Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;

4. Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available, statewide; and

5. Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

Fla. Admin. Code. § 59G-1.010(166). Under the amended plan, the defendants also look to the Code of Federal Regulations section 483.440 for further guidance on how to determine medical necessity. Subsection (b) of that section of the regulations provides that clients who are admitted into an ICF/DD "must be in need of ... active treatment services." 42 C.F.R. § 483.440(b). "Active treatment" is defined as "a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart," and does not include "services to maintain generally independent clients who are able to function with little supervision or in the absence of a continuous active treatment program." 42 C.F.R. § 483.440(a); *see also* Fla. Stat. § 393.063(1) (defining "Active treatment"); Fla. Admin. Code §§ 59G-1.010(2) (defining "Active treatment plan"), & 59G-4.171(4) (establishing the recipient eligibility criteria for "Intermediate Care Facilities for the Mentally Retarded/Developmentally Disabled," including the need for "continual active treatment"). Thus, under Florida's Medicaid Plan, an individual will not be deemed eligible for ICF/DD services unless such services are "determined to be medically necessary for the individual as expressed by a need for continuous active treatment...." *See* Central Admission Policy for Intermediate Care Facilities for Persons With Developmental Disabilities (ICF/DD) in Compliance With *Doe v. Chiles*.

### 2. *Defendants Adopt the Status Tracking Survey*

---

necessity.

*See* Florida Medicaid Plan, Attachment 3.1-A, effective October 1, 1992, replaced by amendment 96-12, April 27, 1998.

After entry of the final judgment, defendants designed and adopted what they deemed a "uniform assessment instrument," known as the Florida Status Tracking Survey, to determine which applicants for ICF/DD services satisfy the medical necessity standard. Under the Status Tracking Survey defendants evaluate applicants for ICF/DD services to determine if their "level of need" indicates that they require "continuous active treatment" so that ICF/DD services are "medically necessary."

The Status Tracking Survey was designed in part to evaluate an applicants' level of need for ICF/DD services in three categories: daily functioning, behavioral risk, and physical/medical status. Those individuals who score a sufficiently high level of need are deemed to require 24-hour care for severe medical, behavioral, and functional deficits. The purpose of the Status Tracking Survey was explained during the show cause hearing by Dr. Ray Foster, who consulted with the State in developing it:

> In terms of taking a look at the [Status Tracking Survey], its purpose ... is really to identify individuals who are at higher Levels of Need for assistance, support, intervention, service, supervision, the kinds of things that you would need in your daily life day to day, to help you eat and dress and function and get around, to take care of behaviors that would pos[e] a risk to yourself or someone else and to take care of health conditions that would require special treatment or extended periods of monitoring or supervision in some way.... [I]n the end the decision you have to come down to is whether or not, based on this person's characteristics and levels of need, are they high enough? Are they substantial enough? Are they enduring enough to require the top ended service that we can deliver in our State. That is really the purpose of this tool.

The new eligibility criteria contained in the Status Tracking Survey were not subject to notice and comment rulemaking and they have never been published.

### 3. *Defendants Develop the Two-Step Review Process*

Determining that an applicant has an appropriate level of need is only part of the first of two steps in defendants' revised eligibility determination process. Under the first step, after an applicant submits an initial request for services, defendants determine both whether the applicant is Medicaid eligible and, using the Status Tracking Survey, whether the applicant is eligible to receive ICF/DD services, i.e., whether such services are medically necessary. If the applicant is determined to be eligible, defendants then schedule an interview with the applicant to discuss alternative services, such as home and community-based waiver services, to ensure that the applicant actually does want ICF/DD services.[6] Eligible applicants who do want ICF/DD services are placed on a waiting list. Under defendants' revised two-step review process, they have

---

[6] In the Home and Community Based Services Waiver Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396n(c), Congress has authorized certain persons with developmental disabilities to receive Medicaid services in a community setting rather than in an institutional facility. As a result, certain individuals who would qualify for ICF/DD placement may instead elect to remain in their homes. *See id.*

90 days from the date the applicant is put on the waiting list after re-affirming the initial request for services to place that applicant in an ICF/DD facility. *See* Florida Medicaid Plan, Attachment 3.1-A(15)(2)

### 4. *Defendants Apply the Status Tracking Survey and the Two-Step Review Process*

Utilizing their revised criteria and admissions practices, defendants began evaluating the level of need of the 600 individuals they had previously identified to the district court as requiring ICF/DD services, plus an additional 34 individuals who were subsequently identified as potentially eligible candidates. Defendants reviewed the files of these individuals using a uniform screening instrument (not the Status Tracking Survey) that measured three indicators of eligibility: 1) Medicaid eligibility; 2) a request for ICF/DD placement; and 3) a preliminary indication that the individuals were likely to need active treatment. Of the individuals screened, only 285 were identified for further evaluation.

Most of the 285 individuals[7] who were identified as likely to meet the criteria for ICF/DD services were further reviewed using the Status Tracking Survey to evaluate their level of need. Of those individuals, 208 were identified as having a level of need of 4, or 5, which was required at that time to support a finding of medical necessity.[8] Those 208 individuals were subsequently interviewed to determine whether they wanted ICF/DD placement or whether they would prefer home and community-based waiver services. According to defendants, of the 208 individuals, only 10 people requested ICF/DD placement after the interviews. Thus, by application of the new eligibility criteria and the revised two-step review process, the defendants reduced their initial estimate of "eligible" individuals awaiting ICF/DD services from 634 to 10.

### B. THE GROUNDS FOR THE CONTEMPT HOLDING

At the show cause hearing, the defendants argued that they should not be held in contempt because they had offered services to all 10 of the remaining "eligible" individuals. The district court was not impressed.

The primary reasons the court gave for finding the defendants in contempt of its 1996 final judgment

---

[7]Nineteen of the 285 individuals were unavailable due to circumstances beyond the control of the defendants.

[8]The Status Tracking Survey scoring system is composed of five levels of need. When the plan of compliance was originally submitted to the district court, only those applicants who scored level 4 or 5 were considered eligible to receive continuous active treatment in an ICF. However, when the defendants applied the Status Tracking Survey criteria to those individuals who had been admitted to ICF's before the change in criteria, they determined that only 78% of those individuals would have scored a 4 or 5. Accordingly, the defendants have since lowered the qualifying score to 3, which covers 91% of the people residing in ICF's. Defendants also represented to the district court that they were in the process of contacting those individuals who had scored a 3 in order to offer them ICF/DD services.

can be organized and listed as follows: 1) defendants had failed to seek adequate funds from the Florida Legislature to comply with the judgment, then had claimed inadequate funds as a basis for their non-compliance;  2) defendants had sought to avoid the effects of the final judgment by making procedurally and substantively improper changes to the state law criteria used to determine eligibility for ICF/DD services;  3) pursuant to the revised two-step application review process, defendants had offered eligible plaintiffs "phantom choices" of community-based treatment alternatives, and had unreasonably interpreted the final judgment as allowing them two successive 90-day time periods in which to determine eligibility for and then ensure the provision of, ICF/DD services;  and 4) defendants had offered improper or inappropriate ICF/DD services to feign compliance.

## C. STANDARD OF REVIEW

We generally review civil contempt orders for abuse of discretion, *see Jove Eng'g, Inc. v. I.R.S.,* 92 F.3d 1539, 1545-46 (11th Cir.1996), and we review findings of fact arising out of contempt proceedings under the clearly erroneous standard, *see Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991).  "[T]he focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue."  *Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir.1990) (citations omitted).  But "a civil contempt order may be upheld only if the proof of the defendant's contempt is clear and convincing."  *McGregor v. Chierico,* 206 F.3d 1378, 1383 (11th Cir.2000).  "This clear and convincing proof must ... demonstrate that 1) the allegedly violated order was valid and lawful;  2) the order was clear, definite and unambiguous;  and 3) the alleged violator had the ability to comply with the order."  *Id.* (internal marks and citation omitted).

## D. ANALYSIS

### 1. *Defendants' Threshold Arguments*

Before turning to the four grounds underlying the district court's contempt holding, we will first address two arguments the defendants make that do not specifically involve those grounds.  They argue in effect that the district court erred by finding them in contempt for failing to provide relief to an extent and on a scale not contemplated by the 1996 final judgment.

### a. Defendants' Reading of the Final Judgment

Defendants' first argument is that the final judgment, strictly construed, required only that they

amend Florida's Medicaid Plan to include "a reasonable waiting list time period" for the provision of ICF/DD services and not that they actually provide those services within a reasonable time. Defendants point out that they have already made an amendment to the Plan adopting the required reasonable waiting list time period. Attachment 3.1-A of the Florida Medicaid Plan, which was amended on April 27, 1998, now provides that:

> (2) The agency's designee will maintain a waiting list for persons who have been determined by the agency's designee to be eligible for, require and have chosen ICF/DD placement. The time from placement on the waiting list until admission to an ICF/DD for such persons will not exceed 90 days.

The contention is that the final judgment did not require the defendants to actually admit those on the waiting list to an ICF/DD as their own amendment to the Plan requires, and that the district court should not have concerned itself with whether the required waiting list time period was actually making any difference in the provision of services.

This contention is untenable. The defendants themselves have not previously interpreted the final judgment so narrowly. For example, in the Emergency Motion to Stay the Final Judgment, which the defendants filed on October 23, 1996, they argued: "Without a stay of the Final Judgment, defendants will be required to immediately begin to create additional institutional infrastructure in the form of bricks and mortar," and that "[p]resumably, if there are not sufficient ICF/DD beds available, the Final Judgment would require the actual construction of facilities within 90 days, an impossible feat." The defendants' new-found interpretation of the final judgment is also directly at odds with our prior interpretation of it. In *Chiles*, we rejected the defendants' argument that the district court abused its discretion "in enjoining them to provide the Medicaid services at issue within ninety days." 136 F.3d at 721-22.

### b. Class-Wide Relief

Although the district court observed in the second sentence of the contempt order that this lawsuit was brought by "thirteen developmentally disabled individuals," the court did not hold the defendants in contempt for failing to timely provide ICF/DD services to those thirteen plaintiffs. Instead, it appears that the court based its finding of contempt, in part, on the defendants' alleged failure to provide services on a system-wide or class-wide basis.[9] Accordingly, one of the grounds of the defendants' challenge to the

---

[9]For example, prior to finding the defendants in contempt, the district court ordered them to complete specific "acts of compliance." The defendants were ordered to provide Medicaid services to the "named members of the class," to identify and locate for immediate delivery of ICF services the 600 persons whom defendants had estimated were eligible for those services, and to fully comply with the final judgment "as to all members of the numbered class." And in the contempt order itself, the court stated that "[o]nly 634 eligible individuals are plaintiffs in this lawsuit...."

contempt order is that the district court exceeded the scope of the final judgment by ordering defendants to provide class-wide relief. This ground of challenge raises issues about the existence of a formally certified class and an implied class.

(i)    *The Existence of a Certified Class*

The defendants contend that they cannot be held in contempt of the 1996 final judgment for failure to provide services to members of the "class" because no class had been properly certified prior to the issuance of the contempt order. Specifically, they say that:

> The contempt order attempts to enforce class-wide relief, apparently for all developmentally disabled people in Florida wanting services. The district court neither defined (and hence appropriately limited) this class, nor did it certify the class.

The district court did not certify a class before issuing its 1996 final judgment or at any time while the case was still properly before it. Although the magistrate judge had recommended that plaintiffs' motion for class certification be granted, the district court did not adopt the magistrate's recommendation or otherwise resolve the class certification question before entering final judgment. Instead, at the time the court issued its final judgment it appears to have deliberately decided not to certify a class. The court still had not done so four years later when it found the defendants in contempt. The court explicitly recognized as much in the contempt order, stating: "Only 634 eligible individuals are plaintiffs in this lawsuit as an order certifying a class was never entered."

However, as we discuss in the next section, the fact that the district court failed to properly certify a class does not necessarily establish that no class exists, or that the defendants cannot be held in contempt for failing to provide class-wide relief.

(ii)    *The Existence of an "Implied Class"*

In three pre-split Fifth Circuit cases, this Court addressed the question of whether the absence of a proper class certification order entered pursuant to Fed.R.Civ.P. 23 was necessarily fatal to the putative class members' claims. *See Johnson v. Gen. Motors Corp.,* 598 F.2d 432 (5th Cir.1979); *Bolton v. Murray Envelope Corp.,* 553 F.2d 881 (5th Cir.1977); *Bing v. Roadway Express, Inc.,* 485 F.2d 441 (5th Cir.1973). Those decisions are binding upon us, *see Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)**,** and we find their reasoning fits the circumstances of this case. Accordingly, although we recognize that the district court failed to properly certify a class, we conclude, nevertheless, that an "implied class" exists.

In *Bing,* the plaintiffs filed their complaint as a class action but did not subsequently move the district court for a class certification order and one was never entered. 485 F.2d at 446. Regardless, the former Fifth Circuit stated "we may infer that the trial court approved the class action nature of this lawsuit" and held that the class relief could stand. *Id.* In reaching its conclusion, the court was persuaded by several factors, including: 1) that the complaint was brought on behalf of the plaintiff and "all others similarly situated"; 2) that the defendants never objected to the "class nature" of the action; 3) that the trial court made statements that suggested it thought the case was a class action; and 4) the judgment rendered by the district court contained relief that was "aimed at a class of people." *Id.* at 446-47. The *Bing* Court concluded that because "[defendant] discriminated against a class, class relief was sought, and class relief was given.... To say that this is not a class action would be to ignore the substance of the proceedings below in favor of an excessively formalistic adherence to the Federal Rules of Civil Procedure." *Id.* The Court went on to conclude that the type of class as well as the identity of the class members could be determined from the nature of the relief contained in the judgment. *Id.* at 447-48. *Bolton* reaffirmed the holding in *Bing* and also recognized that, as a general matter, a Rule 23(b)(2) class does not require class-wide notice as a precondition for its existence.[10] 553 F.2d at 883; *see also e.g., Jefferson v. Ingersoll Intn'l Inc.,* 195 F.3d 894, 897 (7th Cir.1999) ("Rule 23(b)(2) authorizes a no-notice and no-opt-out class for 'final injunctive relief ... [that operates] with respect to the class a whole.' "); *Crawford v. Honig,* 37 F.3d 485, 487 n. 2 (9th Cir.1995) (observing that the right to notice does not apply to class actions brought under Rule 23(b)(2)); *Kincade v. Gen. Tire & Rubber Co.,* 635 F.2d 501, 506 (5th Cir.1981) (same).

In *Johnson,* the issue was whether a plaintiff who was seeking monetary damages was barred from so doing by the preclusive effect of a prior class action. *Johnson,* 598 F.2d at 434. The plaintiff argued that he was not barred because, among other reasons, the class in the preceding action had never been certified. *Id.* Relying on *Bing,* the *Johnson* court rejected plaintiffs' argument. *Id.* at 435. In the course of doing so, it construed the holding in *Bing* as turning on the district court's, and not the parties', treatment of the action as a class action. *Id.* As the *Johnson* court stated, "In short, it is beyond dispute that despite the lack of a proper order certifying [the previous action] as a class suit, the case was in fact a class action and was specifically described and treated as such both at trial and on appeal." *Id.*

---

[10]Fed.R.Civ.P. 23(b)(2) provides that a class may be maintained where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

There are a number of decisions from other jurisdictions that contain language consistent with *Bing*'s holding. *See e.g., Senter v. Gen. Motors Corp.,* 532 F.2d 511, 522 (6th Cir.1976) (recognizing that, although the district court should have ruled on the class certification issue prior to resolving the merits, "the simple fact is that no one was misled as to the class nature of the action"); *see also Navarro-Ayala v. Hernandez-Colon,* 951 F.2d 1325 (1st Cir.1991) (under similar facts as in the present case, the First Circuit held that even in the absence of a Rule 23 certification order, "because this case was instituted by a complaint seeking class relief, implicitly granted class relief, and was conducted for years as a de facto class action, it should and may be recognized as such"); *Graves v. Walton County Bd. of Educ.,* 686 F.2d 1135, 1139-40 (5th Cir.1982) ("[I]t is clear that despite the lack of a formal order certifying this case as a class suit, this case was in fact a class action and was specifically described and treated as such by the parties and the trial court.").

The present case is a strong one for recognizing the existence of an implied class. The plaintiffs filed this suit as a class action and timely filed for class certification. The magistrate judge recommended that class certification be granted. The plaintiffs acted at all times as though the relief entered would extend system-wide. So did the district court. It referred to plaintiffs as a "class" in the final judgment, stating:

> Currently pending, and rendered moot by this Order, is Plaintiffs' Emergency Motion for Preliminary Injunction.... [T]he concerns expressed in that motion are adequately addressed in a ... case pending before this Court.... Plaintiffs in this action, *as a class,* may intervene in [that] action.

(emphasis added). This Court also appears to have treated the case as involving Medicaid applicants other than the named plaintiffs, stating;

> [The plaintiffs] have certainly established that the [defendants'] ongoing violation of federal law is "systemwide." ... The record reveals that hundreds, perhaps even thousands, of eligible developmentally disabled persons are not being provided ICF/DD services with anything resembling reasonable promptness. Consequently, we reject the [defendants'] contention "that there was no showing of statewide or 'system' wide injury."

*Chiles,* 136 F.3d at 722 n. 23.

Moreover, the defendants themselves have always understood that the relief granted in the final judgment was intended to be system-wide, and not just limited to the named plaintiffs. For example, in Defendants' Emergency Motion to Stay Final Judgment, filed October 23, 1996, they argued: "Without a stay of the Final Judgment, defendants will be required to immediately begin to create additional institutional infrastructure in the form of bricks and mortar," and that "[p]resumably, if there are not sufficient ICF/DD beds available, the Final Judgment would require the actual construction of facilities within 90 days, an impossible feat." In defendants' argument on appeal from the final judgment they stated that the "system wide

relief" in the "judgment below" was erroneous as "there was no showing of statewide or 'system' wide injury." And at the November 8, 1998 show cause hearing, counsel for defendants agreed with the court that an estimated 600 people were then in need of ICF/DD services but argued that defendants should not be held in contempt, stating: "It does take time. There are a lot of people, [a] lot of considerations. These decisions, *even though this is a class action,* these are ultimately individualized decisions." (emphasis added).

Notwithstanding all of this, the defendants say that they have always contested class certification. True, but they only contested formal class certification; they did not contest the system-wide nature of the relief contemplated by the final judgment. That much is evident from the objections they submitted to formal class certification, where they argued: "Class Certification is Unnecessary Because the Benefits Of the Relief Sought Will Inure To All Individuals [who are potential] Members Of The Proposed Class" and that "no useful purpose would be served by permitting the case to proceed as a class action inasmuch as the injunction sought would benefit all members of the proposed class." It was not until the contempt proceedings—nearly four years after entry of final judgment—that defendants first suggested that the relief ordered in the final judgment should be limited to the named plaintiffs. In other words, everyone involved in this case, including the defendants themselves, always treated the relief sought and provided in the final judgment as extending system-wide, until the threat of contempt sanctions inspired the defendants to see things differently for the first time. We do not share their vision.

Additional factors militate in favor of recognizing the existence of an implied class in this lawsuit. Plaintiffs did not occasion the delay in certifying the class. They should not be penalized because the district court either forgot to address the certification question sooner, or determined that it was not necessary to do so. *See Senter,* 532 F.2d at 521 (recognizing that "[t]he language of Rule 23(c)(1) is obviously directed to the District Court. It does not impose upon a plaintiff the additional burden of ensuring that the District Court adhere to 23(c)(1)'s directive."). Moreover, as in *Bing,* it is a simple matter to determine the type and scope of the class by looking to the relief contained in the final judgment. As to its type, because we are dealing with injunctive relief, the class is a Rule 23(b)(2) class, and would not require that notice be given to all potential class members. *See Bolton,* 553 F.2d at 883. As to its scope, the district court defined the relief as follows:

> ORDERED AND ADJUDGED that Defendants' shall, within 60 days of the date of this Order, establish within the State's Medicaid Plan a reasonable waiting list time period, not to exceed ninety days, for individuals who are eligible for placement in ICF/DD institutional care facilities.

The general parameters of the class include all "individuals who are eligible for placement in ICF/DD institutional care facilities."

This is also how we viewed matters in our prior opinion in this case where we construed the final judgment language to mean "that [defendants] must incorporate into their present scheme of providing services procedures that ensure a waiting list period of not more than ninety days." *Chiles,* 136 F.3d at 721. That language clearly envisioned a system-wide revision, as is also evident from our recognition that "perhaps ... thousands" of individuals were being denied ICF/DD services in violation of federal law. *Id.* at 722 n. 23.

Therefore, to the extent such recognition is necessary,[11] we recognize the existence of an implied class in this case. We also hold that the existence of that implied class defeats the defendants' challenges to the contempt order premised on the court's failure to certify a class. The parameters of the implied class are as follows:

> Medicaid eligible individuals with developmental disabilities who have requested, and have been determined eligible for, placement in an Intermediate Care Facility ("ICF/DD") but who have not received a placement with reasonable promptness.

To keep the paper current, the district court should enter an order to that effect upon remand.[12]

### 2. *The Four Grounds Underlying the Contempt Holding*

We turn now to the four grounds, which we have previously listed, upon which the district court based its contempt order.

### a. *The Inadequate Funding Ground*

The first ground is that the defendants sought inadequate funds from the Florida Legislature to comply with the final judgment. The district court stated that the defendants had requested only enough funds to reduce the waiting list by 53%, from which the court "inferred that there was never an intent to timely comply with the mandate of the Eleventh Circuit or this Court's Order."

However, the district court made its inadequate funding determination based upon the estimated "[t]wenty-three thousand individuals" who are currently on waiting lists for services. That number is not even

---

[11]Given the nature of the relief at issue, it is not entirely clear that there is a need to recognize a class at all. The relief contained in the final judgment should inure to all Medicaid-eligible developmentally disabled individuals who are eligible for, and request, ICF/DD services. After all, it would seem axiomatic that defendants cannot continue to violate 42 U.S.C. § 1396a(a)(8) as to everyone except the named plaintiffs.

[12]In Part III of this opinion, below, we vacate the court's February 11, 2000 class certification order because the court was without jurisdiction to enter it when the court did. The district court will regain jurisdiction when this case returns to it on remand.

close to the number of individuals who were actually eligible for IFC/DD services but who had not yet received them at the time of the contempt hearing. As we have previously discussed, the defendants estimate, and the plaintiffs do not appear to seriously disagree, that the number of individuals actually eligible for placement in IFC/DD facilities but who had not been placed at the time of the hearing is 634.[13] Indeed, the district court pretty much adopted that number in both its November 10, 1998 order and in the contempt order itself, where the court stated, "[o]nly 634 eligible individuals are plaintiffs in this lawsuit...." The defendants insist that the 23,000 figure represents an estimate of all individuals with developmental disabilities who may need some state services of some kind, although only a small fraction of that number need ICF/DD services.[14] The plaintiffs do not disagree.

"Civil contempt proceedings are brought to enforce a court order that requires a party to act in some defined manner." *Chairs v. Burgess,* 143 F.3d 1432, 1436 (11th Cir.1998) (internal marks omitted). Here, the final judgment did not require the provision of services to any and all developmentally disabled individuals, nor did it require the provision of any Medicaid services other than ICF/DD services. Therefore, to the extent that the district court based its finding of contempt on defendants' failure to request sufficient funds to provide ICF/DD services or any other kind of services to 23,000 individuals, it erred.

*b. The Modification of Eligibility Grounds—The Status Tracking Survey*

The second ground upon which the district court relied to find defendants in contempt involves their modification of the eligibility requirements, which they accomplished through the development and implementation of the Status Tracking Survey. The final judgment ordered the defendants to provide services within 90 days "for individuals who are eligible for placement in ICF/DD institutional care facilities." What the district court found is that instead of providing ICF/DD services to the then-estimated 634 individuals who were "eligible for placement in ICF/DD institutional care facilities," the defendants changed the definition of "eligibility" for placement in those facilities in order to eliminate all but ten of the 634 people from eligibility. The district court reasoned:

> The consequence and obvious intent of adopting the experimental [Status Tracking Survey] tool for assessing need has been to remove a large number of individuals from the list of those eligible for and receiving ICF/DD services. Circumvention of the final judgment entered in 1996, which ordered that services be provided to identified eligible individuals, is thus effectively accomplished.

---

[13]The original estimate was 600, but 34 individuals were subsequently added to the estimate.

[14]The defendants did not indicate whether the "services" sought by these 23,000 individuals was limited to Medicaid services.

The court did not have any problem with the defendants requiring medical necessity as an eligibility criterion for ICF/DD services.[15] But it had serious problems with the use of the Status Tracking Survey to determine medical necessity, and those problems were a large part of the reason the court concluded that the defendants were in contempt of its 1996 final judgment order. The district court did not suggest that the defendants would have been in contempt for making valid changes to the criteria used to determine eligibility, but instead concluded that their conduct was contemptuous because the changes they made with the adoption of the Status Tracking Survey were procedurally and substantively invalid.

The district court thought that adoption of the Status Tracking Survey constituted unlawful rulemaking. The court also determined that the Status Tracking Survey is not a "complete or ready" screening tool and that it is contrary to the substance of the federal Medicaid statute. In particular, the court noted that the Status Tracking Survey does not require a certification of need by a physician and does not provide for an interdisciplinary evaluation prior to admission to an ICF/DD facility. The court also thought that the Status Tracking Survey does not address many important factors that should be considered under the federal Medicaid statute in determining the need for continuous active treatment. Finally, the court found the Status Tracking Survey lacking because it did not include safeguards in the form of an independent review of adverse eligibility determinations.

---

[15]The plaintiffs have not argued to us that medical necessity is an invalid criterion and could not legitimately do so. A state that elects to participate in Medicaid has the option of not providing ICF/DD services at all. *See* 42 U.S.C. § 1396a(a)(10)(A)(ii); 42 C.F.R. § 440.225 ("Any of the services defined in subpart A of this part [which includes the definition of ICF services found at 42 C.F.R. § 440.150] that are not required under § 440.210 and 440.220 [ICF services are not] may be furnished under the State plan at the State's option."). If a state elects to provide ICF/DD services, as Florida has, it must set its eligibility standards in accordance with certain broad federal rules. *See* 42 C.F.R. § 430.0 ("Within broad Federal rules, each State decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures."). Section 1396d(a)(15) provides that the state may elect to provide such services "for individuals who are determined, in accordance with section 1396a(a)(31)(A) of this title, to be in need of such care." 42 U.S.C. § 1396d(a)(15). Section 1396a(a)(31)(A) provides that when the State elects to provide such services, the State Medicaid Plan must provide for a "written plan of care, prior to admission to or authorization of benefits in such facility, in accordance with regulations of the Secretary." 42 U.S.C. § 1396a(a)(31)(A). The relevant regulations provide that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose," 42 C.F.R. § 440.230(b) and that otherwise, "[t]he agency may place appropriate limits on a service based on such criteria as medical necessity...." 42 C.F.R. § 440.230(d).

What all of those statutory provisions and regulations mean is that the defendants were free to limit the provision of ICF/DD services to only those applicants for whom ICF/DD services were deemed medically necessary. *See Rush v. Parham,* 625 F.2d 1150, 1155 (5th Cir.1980) ("[T]he Medicaid statutes and regulations permit a state to define medical necessity in a way tailored to the requirements of its own Medicaid program."); *King by King v. Sullivan,* 776 F.Supp. 645, 651 (D.R.I.1991) ("[T]he medical eligibility criteria for ICF-MR placement under the State Plan require 'medical necessity'.... Such a restriction on eligibility is proper....").

The reasoning that led the district court to conclude that creation and use of the Status Tracking System to determine medical necessity violated the 1996 final judgment order appears to have been this: 1) the new eligibility criteria contained in the Status Tracking System are invalid, either because they were adopted in a procedurally defective manner or because they are substantively in violation of the Medicaid statute, or because they are simply unreliable; 2) using those new criteria the defendants denied ICF/DD services to a number of individuals; 3) many of these individuals would have been eligible under the old criteria; 4) with the result that defendants have failed to timely provide ICF/DD services to individuals who are "truly eligible," meaning eligible under the original criteria which are the only remaining ones after the Status Tracking Survey is thrown out. Therefore, the reasoning goes, the defendants improperly circumvented and thereby violated the final judgment.

The district court's finding of contempt cannot stand if the first premise set out above, which is that the Status Tracking Survey is invalid, falls. The district court gave four reasons for concluding the Status Tracking Survey was invalid, and we take up each one of those reasons in turn.

(i)      *Rulemaking and Procedural Requirements*

The district court held that the Status Tracking Survey was procedurally invalid because it had been adopted "without following formal rulemaking procedures and without publishing the changes so that the public could understand how eligible persons would be affected." That failure to comply with rulemaking requirements was fatal, in the court's view.

(1) Compliance with the APA

In holding that the defendants, in adopting the Status Tracking Survey, failed to comply with administrative rulemaking requirements,[16] the district court cited both federal cases applying the federal Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), as well as state cases applying Florida's Administrative Procedure Act, Fla. Stat. § 120.52 *et seq. See Cleveland Clinic Florida Hosp. v. Agency for Health Care Admin.,* 679 So.2d 1237, 1242 (Fla. 1st Dist. Ct.App.1996). ("The statutory framework under which administrative agencies must operate in [Florida] provides ... mechanisms for the adoption or amendment of rules."). However, the federal APA clearly does not apply to state agencies. *See* 5 U.S.C. § 701(b)(1) (defining "agency" as certain authorities of the "Government of the United States").

---

[16]For purposes of this analysis, we assume, without deciding, that the adoption of the Status Tracking Survey constituted "rulemaking."

Moreover, to the extent that the defendants were in violation of Florida's own administrative procedures act, federal courts do not have the authority to compel state actors to comply with state law. *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment."); *see also Walker v. Mintzes,* 771 F.2d 920, 933 (6th Cir.1985) ("[A] federal court should not rule upon the validity of a state regulation challenged on the sole ground that it was not properly adopted under state law by the state administrative agency.").

There is, to be sure, some authority holding that a state administrative agency's violation of state law can, under certain circumstances, also constitute a violation of federal law thereby avoiding the Eleventh Amendment problems described in the *Pennhurst* opinion. In *Barnes v. Cohen,* 749 F.2d 1009 (3rd Cir.1984), the Third Circuit determined that state officials were not adhering to their own regulations that were passed in accordance with the Aid to Families with Dependent Children ("AFDC") program. *Id.* at 1018. In response to the state's argument that such a holding contravened *Pennhurst,* the Court pointed to 42 U.S.C. § 602(a)(1), which requires state AFDC plans to "be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them." *Id.* at 1019. The Court interpreted that provision as requiring states to adhere to their own AFDC regulations, and held that the state's violation of its own regulations also constituted a violation of 42 U.S.C. § 602(a)(1), rendering *Pennhurst* inapplicable. *Id.; see also Wisconsin Hosp. Ass'n v. Reivitz,* 820 F.2d 863, 868 (7th Cir.1987) ("The decree might seem to raise problems under [*Pennhurst* ] ... but it does not, because the federal regulations make compliance with the state plan ... a federal duty.").

A similar argument could be made in this case because section 1396a(a)(1) of the Medicaid Act contains language identical to that found in 42 U.S.C. § 602(a)(1).[17] *See* 42 U.S.C. § 1396a(a)(1). *But see Oberlander v. Perales,* 740 F.2d 116, 119 (2d Cir.1984) (rejecting a similar argument regarding section 1396a(a)(1) as "tortuous," noting that "there is no authority anywhere supporting the proposition that a state

---

[17]Section 1396a(a)(1) provides:

> A State plan for medical assistance must—
>
> (1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them.

Medicaid regulation becomes a federal law merely by virtue of its inclusion in a state plan required by federal law.").

But even if we were inclined to adopt the reasoning set out by the Third Circuit in *Barnes,* it would not apply to the facts of this case. Here, unlike *Barnes,* the defendants are not alleged to have violated a state Medicaid regulation or a provision of the state Medicaid plan. Instead, the district court determined that defendants violated certain general rulemaking requirements set forth in Florida's Administrative Procedure Act. There is nothing in the federal Medicaid statute or regulations that would require the defendants to follow Florida's APA. As this Court has previously explained in another Medicaid case where we distinguished *Barnes:*

> Assuming *arguendo* that *Pennhurst II* is not applicable to a case such as that described in *Barnes v. Cohen,* we hold that we are not faced with such a situation. [Plaintiff] has not alleged that [the commissioner of the Alabama Medicaid Agency] has violated the state Medicaid plan or regulations promulgated pursuant to the state Medicaid plan. Instead he argues that [the commissioner] has not complied with the state constitution and with state statutes which are not part of the Medicaid plan. Thus, the principles announced in *Barnes* are not relevant here.

*Silver v. Baggiano,* 804 F.2d 1211, 1214 (11th Cir.1986). We have the same situation here, and our holding in *Silver* fits this case precisely.

Thus, the federal APA did not apply to the defendants' adoption of the Status Tracking Survey, and any violations of Florida's APA are not cognizable in this type of federal court proceeding. Therefore, there is no proper basis for the district court's holding that defendants adopted the Status Tracking Survey in a procedurally defective manner, and any procedural problems with its adoption cannot serve as a reason for holding defendants in contempt.

### (2) Compliance with the Medicaid Statute

In holding the defendants in contempt, the district court also concluded that, under the Medicaid statute, "notice of the rule change" should have been provided for the numerous individuals who would have been eligible under the old criteria, but who were denied services under the revised criteria. It determined that such notice is mandated, citing 42 U.S.C. § 1396a(a)(3) and 42 C.F.R. §§ 431.206, 431.210 431.220, 435.912 and 435.919(a).[18] If we construe the district court's statement literally—that the defendants were

---

[18]Section 1396a(a)(3) provides, "A State plan for medical assistance must provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied...." Section 431.206 of the Code of Federal Regulations provides that a state agency must provide notice of an applicant's right to a hearing. 42 C.F.R. § 431.206(c). Section 431.210 sets forth the contents of that notice. 42 C.F.R. § 431.210. Section 431.220 prescribes the circumstances under which an applicant who requests a hearing is entitled to one. 42 C.F.R. § 431.220.

required to provide the plaintiffs with notice "of the rule change"—the statutory and regulatory provisions the district court relied on are inapposite. Those provisions involve only notice of denials of individual Medicaid applications, and impose no obligation to publish notice of rule changes that will have a general impact on eligibility.

However, if we construe the district court's statement to mean only that those individuals denied services pursuant to the new criteria have a right to notice and an opportunity to be heard, then the district court is correct on that point. *See e.g., Cramer v. Chiles,* 33 F.Supp.2d 1342, 1351-52 (S.D.Fla.1999) ("Medicaid statutes require that a state provide individuals with an opportunity for a hearing before the governmental agency when a claim for medical assistance is denied or is not acted upon with reasonable promptness, including where the Medicaid agency takes action to suspend, terminate, or reduce services."); *Parry v. Crawford,* 990 F.Supp. 1250, 1258 (D.Nev.1998) ("[T]he Medicaid Act clearly provides for notice upon the denial of an application.... In addition to denial of a claim for services, certain other actions, such as termination, reduction, or suspension of services also entitle the applicant to a hearing.") (citation omitted); *Catanzano v. Dowling,* 847 F.Supp. 1070, 1081 (W.D.N.Y.1994) ("Under federal regulation, the State Medicaid agency *must* provide a proper notice to the patient informing him of the proposed change and his right to a hearing both at the time that the individual initially applies for Medicaid and at any time the Medicaid agency takes 'any action affecting his claim.' ") (emphasis in original).

The problem with this part of the district court's reasoning is that recognizing the plaintiffs have such a right does not establish that the right was violated in this case. The court's order contains no findings that anyone who was denied services failed to receive notification of that denial or was deprived of a requested hearing. More fundamentally, even if we assume that defendants violated the Medicaid Act—either because they failed to provide notice to those denied services or they failed to provide hearings to those who requested them—that would not, by itself, establish that the defendants had violated the final judgment. The final judgment dealt only with the timely provision of services, and not with notice and a hearing in connection with the denial of services. It follows that the defendants' failure, if any, to provide notice and a hearing cannot support the district court's finding of contempt.

---

Section 435.912 specifies that an applicant who is determined to be ineligible for Medicaid must be provided written notice of the agency's decision and an explanation of their right to request a hearing. 42 C.F.R. § 435.912. Section 435.919(a) provides that Medicaid recipients whose services are to be terminated, discontinued or suspended are to be given adequate notice. 42 C.F.R. § 435.919(a).

(ii)    *Eligibility Requirements*

The district court also determined that the Status Tracking Survey contravenes certain requirements of the Medicaid statute pertaining to eligibility for ICF/DD services. In particular, the court stated that the federal regulations require that "the initial certification of need for in-patient care be made by a physician and that the evaluation for admission to an ICF/DD or payment for the service be conducted by an interdisciplinary team." The court was apparently troubled by the fact that defendants employ the Status Tracking Survey to make initial eligibility determinations even though it does not provide for an initial certification of need by a physician or an evaluation by an interdisciplinary team.

While it is true that the federal Medicaid regulations prescribe certain standards and procedures that must be satisfied before an applicant can be admitted to an ICF, those provisions do not address, nor are they inconsistent with, the use of a screening mechanism to identify applicants who are not likely to need continuous active treatment services. For example, section 483.440 provides, in pertinent part:

> (b) *Standards: Admissions, transfers, and discharge.*
>
> (1) Clients who are admitted by the facility must be in need of and receiving active treatment services.
>
> (2) Admission decisions must be based on a preliminary evaluation of the client that is conducted or updated by the facility or outside sources.

42 C.F.R. § 483.440. Section 456.360(a) mandates that "A physician must certify for each applicant or recipient that ICF services are or were needed." 42 C.F.R. § 456.360(a). Section 456.370 provides:

> (a) Before admission to an ICF ... an interdisciplinary team of health professionals must make a comprehensive medical and social evaluation and, where appropriate, a psychological evaluation of each applicant's ... need for care in the ICF.

42 C.F.R. § 456.370.

None of these regulations, which are designed to ensure that only applicants who are in need of ICF services are placed in institutional care facilities, suggest that the defendants cannot use the Status Tracking Survey as a screening mechanism in addition to the procedures mandated by the regulations. The Status Tracking Survey does not supplant the mechanisms the regulations require, but instead works in concert with them to screen out applicants who are unlikely to need continuous active treatment services. Those applicants who satisfy the Status Tracking Survey will still be evaluated, prior to their admission to an ICF, in accordance with the appropriate regulations, including §§ 483.440, 456.360(a) and 456.370. Thus, to the extent that the district court's finding of contempt was predicated on the fact that the Status Tracking Survey is inconsistent with the Medicaid eligibility requirements set out in the federal regulations, the finding of

contempt cannot stand.

In the context of analyzing the relationship between the Status Tracking Survey and the eligibility requirements set out in the Medicaid statute, the district court opined that the Status Tracking Survey "is not a complete or ready tool," and that "[n]othing offered by the defendants showed the survey to be a valid instrument for measuring the needs of developmentally disabled individuals." For purposes of this analysis, we will assume that conclusion represents a finding of fact that is not clearly erroneous. *See generally Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991). Nonetheless, it is irrelevant to the issue of contempt.

The issue before the district court was whether the defendants had violated the terms of the final judgment. Parties cannot be held in contempt unless they have violated a clear, definite and unambiguous order. *See McGregor v. Chierico,* 206 F.3d 1378, 1383 (11th Cir.2000). The final judgment did not address eligibility requirements or the efficacy of screening mechanisms. It dealt only with the timely provision of services to "individuals who are eligible for placement in ICF/DD institutional care facilities." For that reason, the defendants cannot be held in contempt based solely on the district court's appraisal of the Status Tracking Survey, even if we assume that it is "not a complete or ready tool" and that it is not "a valid instrument for measuring the needs of developmentally disabled individuals."

(iii)     *Continuous Active Treatment Requirements*

The district court also questioned the validity of the Status Tracking Survey on grounds that it fails to include all of the factors Medicaid requires to be considered when determining an individual's need for continuous active treatment. The court was specifically concerned with the Status Tracking Survey's failure to contain any provisions to ensure that applicants who are denied services do not regress to the point of needing them. Although the district court did not cite any statutory or regulatory provision requiring anti-regression care, it may have had in mind 42 C.F.R. § 483.440(a)(1). That regulation defines active treatment as:

> [A] continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart, that is directed toward—
>
> (i) The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible;  and
>
> (ii) The prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. § 483.440(a)(1). Another part of the same section also requires that "[c]lients who are admitted

by the facility must be in need of and receiving active treatment services." 42 C.F.R. § 483.440(b)(1).

Regulations such as section 483.440 establish certain requirements that ICF facilities must satisfy in order to participate in the Medicaid scheme. *See* 42 C.F.R. § 483.400—483.480. More specifically, section 483.440 imposes two requirements relevant to the present discussion. First, it establishes the minimum level of services that an ICF facility must provide before the facility will be permitted to participate in Medicaid. *See* 42 C.F.R. § 483.440(a)(1). As the district court correctly observed, those services must be designed to prevent the regression of a client's functional status. Second, it establishes that individuals who are admitted to a facility must satisfy a certain baseline level of need before the facility which houses those clients will be allowed to participate in the Medicaid scheme. *See* 42 C.F.R. § 483.440(b)(1). If an ICF admits those who fall below the baseline level of need prescribed in section 483.440(b)(1), then that facility will not qualify to participate, at least with respect to those individuals.

However, to say, as the regulation does, that applicants who are admitted to ICF's must be in need of active treatment services, is not the same as saying that all applicants who are in need of active treatment services must be admitted to ICF's. This is an important distinction, one that is fundamental to the joint federal-state Medicaid scheme. As we have explained previously, the federal Medicaid statute does not require states to provide ICF/DD services. *See* 42 U.S.C. § 1396a(a)(10)(A)(ii). And states that elect to provide those services are granted substantial discretion in the formulation of their eligibility standards. *See* 42 C.F.R. § 430.0. Section 483.440 requires only that participating facilities provide ICF/DD services in a particular manner and solely to those individuals who truly need them. It does not require that ICF/DD services be provided to any individual who might benefit from them.

(iv)    *Review Requirements*

The district court's final criticism of the Status Tracking Survey is that it does not provide for review of adverse decisions that result from application of its criteria, and that the absence of such review procedures renders the Status Tracking Survey "substantively faulty." The court explained:

> [U]se of the [Status Tracking Survey] as a screening mechanism is substantively faulty because it ... fails to provide for an independent review of an adverse determination....There are no safeguards against arbitrariness in canceling services to persons now receiving or who were eligible for ICF/DD services. The claimed protection against unfair cancellation of services, according to the defendants, is an examination of records by the agency's in-house physician. First, as previously noted, the review is not independent. Second, the records are admittedly incomplete for an adequate review.... Assuming that the [Status Tracking Survey] could be constructed to serve as a valid instrument it is clear that much is left to be done.

Those may (or may not) be valid criticisms of the Status Tracking Survey, but the district court did not

identify any particular provision of the Medicaid statute or its accompanying regulations that would require a different review procedure. More fundamentally, the district court's reasoning goes outside of the appropriate boundaries of the contempt proceeding. The defendants cannot be held in contempt of the 1996 final judgment, which says nothing about review mechanisms, simply because they adopted a "faulty" one.[19]

(v)  *Summary*

The district court's holding that defendants were in contempt of its 1996 final judgment was based in large part on the premise that the Status Tracking Survey was procedurally and substantively invalid. That premise does not withstand scrutiny. So far as procedural rulemaking requirements are concerned, the federal APA does not apply to the defendants' adoption of the Status Tracking Survey, and violations of state administrative procedure law are not cognizable in federal court in the circumstances of this case. It has not been established that the defendants' development and implementation of the Status Tracking Survey violates any provision of the Medicaid statute or its accompanying regulations. Finally, even if the Status Tracking Survey is a faulty screening mechanism, that alone does not violate the terms of the 1996 final judgment. So, any perceived or actual flaws in the Status Tracking Survey cannot serve as a basis for holding the defendants in contempt for failure to comply with the 1996 final judgment.

### c. The Two-Step Review Process

Moving beyond the Status Tracking Survey issues, the next two grounds upon which the district court found defendants in contempt involve defendants' two-step application review process that is initiated when an applicant applies for ICF/DD services. An application triggers two simultaneous inquiries: an inquiry as to whether the applicant is Medicaid eligible and also an inquiry as to whether the applicant is eligible for

---

[19]Even if we were to assume that the Status Tracking Survey violates a substantive provision of federal law and is therefore invalid, that conclusion, by itself, would not provide a sufficient basis for holding defendants in contempt of the final judgment. The district court thought that by using the "invalid" Status Tracking Survey defendants had failed to timely provide ICF/DD services to individuals who would have been eligible had they been evaluated under the pre-Status Tracking Survey criteria. But even so, the defendants could not have been found in contempt unless the district court identified at least one individual who was eligible for ICF/DD placement under the original criteria, but who was left on a waiting list for more than 90 days as a result of the Status Tracking Survey. The district court made no such findings.

Though it was not a basis of contempt that was discussed in the district court's order, the plaintiffs also argue on appeal that the new eligibility criteria violates their substantive due process rights. They argue that Florida has created a right to ICF/DD services in a particular class of individuals—its Medicaid-eligible, developmentally disabled citizens—and cannot now deprive those individuals of that right without due process of law. Regardless of the validity of this argument, a matter about which we express no opinion, it cannot serve as an independent basis for upholding the district court's finding of contempt, which is the only issue before us.

ICF/DD services. Under defendants' interpretation of the law, they have 90 days to complete these two inquiries, which are together the first step of the process.

If the applicant is determined to be eligible for ICF/DD services under Medicaid—the first step of the process—defendants then schedule an interview with the applicant to explain the availability of alternative services, specifically home and community-based waiver services, and to offer the applicant the choice between those and ICF/DD services. If the applicant chooses ICF/DD services after the interview, then there is a maximum 90 day waiting period for the provision of services set out in the final judgment, and that 90 day period does not begin running until the first step of the process is completed. The result is that under defendants' two-step application review process, from the time the applicant initially requests ICF/DD services, defendants allow themselves not one but two successive 90 day time periods to place the applicant in a facility. The district court had two problems with the defendants' two-step application process that contributed to its conclusion that they had violated the 1996 final judgment.

(i)     *Phantom Choices*

First, the district court was persuaded that defendants were offering applicants "phantom choices" between ICF/DD services and the alternative community-based waiver services. Specifically, the court was concerned that applicants were not being told that if they elected to receive the alternative services they were not assured of receiving them in the immediate future.

But the final judgment only involved the time period for providing ICF/DD services. It said nothing at all about the provision of any other type of services, nor did it even specify how the defendants were to go about offering ICF/DD services. As we made clear in our prior decision in this case: "The plain language of the district court's injunction does not prevent the appellants from continuing to pursue the home and community-based waiver services program in accordance with federal statutory and regulatory dictates." *Chiles,* 136 F.3d at 721. Counsel for the plaintiffs recognized as much, in a statement made at a hearing before the district court that we cited in *Doe v. Chiles:*

> Our position to the state has always been, if they want to provide everybody with services so that they don't need to be taken out of their current housing arrangement ... that's great. There won't be a lawsuit. They are always welcome to provide services to people in the manner in which they see fit ... And if ... they want to entice people away by offering some other package of services, that's great.

136 F.3d at 721 n. 22.

(ii)     *The Ninety-Day Time Period*

The second problem the district court had with the two-step review process concerned what it termed the "unreasonable" construction by the defendants of the final judgment as allowing them 90 days from the date of the initial request for services to determine eligibility, plus an additional 90 days to actually place an applicant in an ICF/DD facility who is determined to be eligible and wants to be placed. The district court thought it clear that the final judgment required ICF/DD placement within 90 days of the application: "There is no ambiguity in the final judgment. Any request from a developmentally disabled individual or his/her guardian for ICF/DD services, in whatever form, starts the 90-day time period in which the defendants are to evaluate the individual and provide or deny services."

Again, it is worth emphasizing this is a contempt proceeding, and the question properly before the district court was whether or not defendants had violated "a clear, definite and unambiguous" order, *McGregor,* 206 F.3d at 1383. Our reading of the final judgment in this case does not convince us that it clearly and unambiguously prescribes the time limit for determining eligibility. The final judgment provides only that defendants must establish a waiting list, "not to exceed ninety days, for individuals who are eligible for placement in ICF/DD institutional care facilities." The final judgment does not address the question of when that 90 day waiting period is triggered, or how long the defendants have to determine who is eligible.

We need not choose between the competing interpretations of the final judgment. It is enough that there are two reasonable, competing interpretations, which is the very definition of ambiguity. Given the ambiguity in the final judgment, defendants' conduct in accordance with their reasonable interpretation of the judgment as permitting them to run the eligibility determination phase and the placement phase successively rather than concurrently cannot be contumacious. *See NBA Properties, Inc. v. Gold,* 895 F.2d 30, 32 (1st Cir.1990) (any ambiguities in a judgment are to be construed in favor of the alleged contemnor).[20]

---

[20]We add that it is by no means clear that defendants' two-step application review process is inconsistent with federal law. There is nothing in this Court's prior opinion in this case, or in the Medicaid Act, or the federal regulations that directly addresses the question. Section 1396a(a)(8) provides that medical assistance shall be "furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). In our prior opinion, we upheld the district court's conclusion that section 1396a(a)(8) "creates a federal right to reasonably prompt assistance, that is, assistance provided without unreasonable delay." *Chiles,* 136 F.3d at 717. Further, we upheld the district court's conclusion that "reasonable promptness" meant a period not to exceed 90 days. *See id.* at 721-22. That is as far as our decision went. *See id.* at 722 (noting that "[t]he injunction is crafted *only* toward generating a 'reasonable waiting list time period' for eligible individuals.") (emphasis in original). We did not address the precise question of whether the time period for determining who is eligible for ICF/DD services runs concurrently with the 90 day waiting period in which those services must be furnished.

Section 435.911(a) of the Code of Federal Regulations provides that:

### d. Improper Placements

The final ground on which the district court based its conclusion that the defendants were in contempt concerns certain ICF/DD placements that the court deemed improper because the facilities were not close to the beneficiaries' homes, or the beneficiaries were placed in co-ed facilities without first determining whether they possessed the ability to use appropriate sexual caution, or for both reasons. While these are concerns, they are not concerns that were addressed in the final judgment. Therefore, defendants cannot be held in contempt of the 1996 final judgment on the basis of the inappropriateness of any ICF/DD placements.

For all of these reasons, we conclude that the district court's order holding defendants in contempt must be reversed.[21]

### 3. *Expansion of the Final Judgment*

Defendants also challenge as overly broad the district court's reading of the injunctive relief provided in the final judgment. The district court stated that, pursuant to the final judgment entered in 1996, it is "now settled law ... that the defendants must provide a comprehensive, effectively working plan that provides adequate and appropriate services to eligible individuals within a reasonable time period." The court went on to hold that defendants were to be fined $10,000 per day "until a comprehensive plan, which comports with the letter and spirit of the judgment entered August 28, 1996, is submitted, ready for implementation."

Defendants contend that the district court's requirement of a "comprehensive plan" that provides "adequate and appropriate services" and that comports with the "spirit" of the final judgment, inappropriately expands the original scope of that judgment. They argue that the contempt order, read in its entirety, "can

---

The agency must establish time standards for determining eligibility and inform the applicant of what they are. These standards may not exceed—

(1) Ninety days for applicants who apply for Medicaid on the basis of disability ...

42 C.F.R. § 435.911(a). Under defendants' reading of the statutory and administrative scheme, they have 90 days to "determin[e] eligibility," 42 C.F.R. § 435.911(a), followed by 90 days to furnish assistance to those applicants determined to be "[Medicaid] eligible individuals," 42 U.S.C. § 1396a(a)(8). The only regulation that specifically addresses the time period for furnishing services, as opposed to determining eligibility therefor, provides only that the state agency must "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930. Beyond these provisions, neither party has pointed us to any controlling authority that specifically addresses the question of whether the eligibility determination and the provision of Medicaid services to eligible individuals are to be performed successively or concurrently.

[21]Because we conclude that the finding of contempt cannot be sustained, we need not reach defendants' arguments regarding whether the particular sanctions entered against them constituted an abuse of discretion.

only mean that the state of Florida must completely restructure its Medicaid program for the developmentally disabled." They base this assertion on the various grounds, previously discussed, upon which the district court found them in contempt, including the court's conclusion that defendants sought inadequate funds to deal with the 23,000 individuals on waiting lists, the court's disapproval of the defendants' new standards for determining eligibility, its conclusion regarding the time limits for determining eligibility and providing services, and its objections to the manner in which defendants were offering and providing alternative services.

The district court perceived there to be a wide array of problems with the manner in which defendants were providing ICF/DD services and decided that all of those problems could be remedied with a contempt order. As we have already decided, however, the matters that troubled the district court had not been addressed in the final judgment, so they cannot serve as a valid basis for holding defendants in contempt. *See Reynolds v. Roberts,* 207 F.3d 1288, 1300 (11th Cir.2000) ("Long standing precedent evinces a strong public policy against judicial rewriting of consent decrees.[22] A district court may not impose obligations on a party that are not unambiguously mandated by the decree itself.") (internal marks and citations omitted).

If the problems the district court perceived with the way in which defendants are providing Medicaid services—the lack of sufficient funding, the change in eligibility criteria, the time limit for determining eligibility, or the manner in which alternative services are provided—result from violations of state or federal law requiring judicial intervention, they can be addressed in another action.[23] *Id.* at 1301. Alternatively, under appropriate circumstances and after the proper procedures have been followed, the original injunction in this case might have been modified to address the problems. *See Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 380, 112 S.Ct. 748, 758, 116 L.Ed.2d 867 (1992) ("[S]ound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.") (citation omitted); *see also United States v. United Shoe Mach. Corp.,* 391 U.S. 244, 251-52, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968) ("If

---

[22]Although *Reynolds* involved a consent decree, what it said is also applicable to non-consent decrees, because a consent decree is treated as "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992).

[23]In fact, there are currently multiple class action lawsuits before the district court that involve at least some of the issues raised in this case. *See Prado-Steiman v. Bush,* 221 F.3d 1266, 1282 n. 17 (11th Cir.2000) (noting that there are a total of five cases pending before Judge Ferguson pertaining to the provision of ICF/DD services).

the decree has not ... achieved its principal objects ... the time has come to prescribe other, and if necessary more definitive, means to achieve the result.") (internal marks omitted); *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 407 (5th Cir.1971) ("It is well settled that the issuing court has continuing power to supervise and modify its injunctions in accordance with changed conditions."). Notice must be given, along with an opportunity to be heard, and, if aggrieved, either party may appeal.

Here, the principal object of the 1996 final judgment injunction, as interpreted previously by this Court, is to enforce plaintiffs' "federal right to reasonably prompt provision of assistance under section 1396a(a)(8)." *Chiles,* 136 F.3d at 719. The "assistance" at issue is the provision of ICF/DD services to eligible individuals. If ICF/DD services are not being provided in a reasonably prompt manner to eligible individuals, the five-year old injunction may be modified or a new one entered prescribing additional measures aimed at accomplishing this result, but only after proper procedures are followed. Compliance with the modified injunction or a new one can then be enforced, if necessary, through a contempt proceeding.

#### 4. *Governor Bush as a Party*

We are persuaded by defendants' argument that because Governor Chiles had been dismissed from this lawsuit in 1992, there was no basis for "substituting" Governor Bush in the present case, and therefore there was no basis for holding the Governor in contempt. Accordingly, Governor Bush is hereby dismissed from the case and his name should be struck from the case style.

### III. DISCUSSION: THE DELAYED CLASS CERTIFICATION ORDER

In their second appeal, defendants challenge the district court's February 11, 2000 order formally granting class certification, which was entered approximately three months after the defendants had filed their notice of appeal from the contempt order, and four years after the final judgment was entered. We have already recognized the existence of an implied class in this case and have directed the district court on remand to formally enter an order reflecting it, which takes most of the weight off this part of the consolidated appeal, but the defendants are entitled to have their appeal of the district court's February 11, 2000 order, which is still on the books, decided.

Defendants primarily contest the delayed certification order on jurisdictional grounds. They assert that their act of filing the notice of appeal from the district court's contempt order divested the district court of jurisdiction to take further action in the case. They are correct that, as a general rule, the filing of a notice of appeal divests the district court of jurisdiction over those aspects of the case that are the subject of the

appeal. *See Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982); *Weaver v. Fla. Power & Light Co.,* 172 F.3d 771, 773 (11th Cir.1999). However, it may not divest the district court of jurisdiction over collateral matters not affecting the questions presented on appeal. *See Weaver,* 172 F.3d at 773; *cf. Resolution Trust Corp. v. Smith,* 53 F.3d 72, 76 (5th Cir.1995) (the district court maintains jurisdiction to order stays or modify injunctive relief).

The existence or non-existence of a class certification order was one of the issues on appeal from the contempt order. In their appeal of the contempt order, defendants argued that the district court exceeded its jurisdiction on remand by requiring class-wide relief in a case where no class had ever been certified. Thus, the existence of a certified class is an "aspect of the case" that is the subject of the appeal. *See Griggs,* 459 U.S. at 58, 103 S.Ct. at 402. Accordingly, defendants' filing of the notice of appeal divested the district court of jurisdiction to enter an order that directly impacted one of the questions proffered for review.[24] The February 11, 2000 order should be vacated.

## IV CONCLUSION

We REVERSE the district court's October 7, 1999 contempt order, and its February 11, 2000 class certification order. We REMAND for further proceedings consistent with this opinion.

---

[24]Our decision that the district court lacked jurisdiction to enter the class certification order renders moot the defendants' other arguments about that order.